JONES, Chief Judge,
delivered the opinion of the court:
The plaintiff, a nonprofit organization, owned and operated a military academy for boys at Hollywood, Florida,, during the time involved in this suit.
On May 27, 1942, the Government took possession of the* physical properties and used them continuously until September 1, 1944.
The plaintiff sues for what it alleges to be the amount necessary to restore the property to its condition at the time of taking, reasonable wear and tear excepted; that is,, the amount of the excess waste and damage to which it claims the property was subjected.
*778 On the amount necessary to restore the property or to pay the excess waste and damage, the parties are far apart.
General Sandy Beaver organized the school about 1913 or 1914 and operated it as sole owner until 1942, at which time the plaintiff corporation was organized and the property transferred to the corporation. The school was operated under a board of six trustees of which the general, his wife and son are members, and the other three are prominent ■citizens of Gainesville, Georgia, where a similar school is operated. Unless otherwise noted the term plaintiff will be used to refer to the ownership of the school throughout its period of operation.
At the time the property was taken over by the defendant there were six buildings, including barracks, class rooms, gymnasium, chapel, drill hall, dining room and other facilities necessary for a high-grade military academy, and for the housing of cadets, teachers and officers. The property included a number of lots and about 15 acres of additional •ground. It was fully equipped for the operation of a military school.
In April 1942 two representatives of the Navy contacted representatives of the plaintiff in reference to the use of the premises by the Navy. Soon thereafter General Beaver and other representatives of the plaintiff were invited to come to Washington for the purpose of discussing the leasing of the premises. At that conference the matter of leasing the Hollywood property was discussed and a rental price of $50,000 per year agreed upon. It was understood that .a formal lease would be prepared by the Navy and forwarded to plaintiff for execution. On May 27, 1942, before the receipt of a draft of the lease agreement, the plaintiff •delivered to representatives of the Navy the keys to the Hollywood property, and the Navy entered on the premises ■and established an aerial free gunnery school which continued in operation until September 1,1944.
The Navy mailed to plaintiff about June 1942 a form of lease to be executed. However, in this lease Sandy Beaver, President, was named as lessor. A short time theretofore the corporation had been organized. The plaintiff did not *779 sign the lease form as prepared, but prepared another form of lease reciting the Riverside Military Academy as lessor, and making certain other changes to which reference is made in finding 8. In both leases the rental to be paid by the Government was the same, to wit, $50,000 per year.
When the lease agreement as redrafted and executed by the plaintiff was received by the Navy it was not returned to the plaintiff. The plaintiff made inquiry from time to time, but received no word from the Navy until November 20,1942, when it was advised that the Bureau of Yards and Bocks had determined that it was not in accord with the leasing price and the terms of the lease agreement, and that condemnation proceedings would be filed.
On March 2, 1943, the defendant instituted condemnation proceedings in the appropriate district court. It deposited $26,016.86 for the period May 27, 1942, to June 30, 1943, which was based on a proposed annual rental of $24,000 per year. The condemnation sought the property for the period May 27,1942, to June 30,1943, with the right to renew from year to year for the duration of World War II and one year thereafter.
After a trial by jury in the United States District Court just compensation for the use and occupancy of the plaintiff’s premises was fixed at $44,000 per annum. This rate of rental was paid for the entire period of occupancy so the amount of rental for the period of occupancy is not here involved.
At or about the time of the occupancy by the Navy the plaintiff caused an inventory of the furniture and equipment on the premises to be made. This inventory was checked by representatives of the Navy and approved as of June 10, 1942.
The buildings extended over approximately four city blocks and contained approximately 400 rooms. These buildings are described in detail in finding 14.
The grounds were landscaped with appropriate shrubbery.
During the period of operation by plaintiff a strict discipline of the student body was maintained. Daily inspections were made of living quarters with a daily report to an -official of the school of any furniture, equipment or part *780 of the building needing repair. Defacing of walls or the placing of pictures on the walls was prohibited. Needed repairs or replacements were reported within 24 hours and were cared for with reasonable promptness. The fall and spring terms of the school were carried on at Gainesville,. Georgia, and the winter term from about J anuary 1 to April 1 was operated at Hollywood, Florida. During the period from April 1 to January 1 a caretaker was left in charge of the premises, who, with such assistance as needed, would do whatever work was necessary to have the premises ready for occupancy when school was resumed the following-January.
During the period of defendant’s occupancy an aviation free gunnery school was carried on. There was an average-of 650 or 700 men stationed on the premises.
Some changes were made by the Navy. Certain additions and alterations were also made to the property. These were made for the Navy’s convenience and some of them were a detriment to the use of the property by the plaintiff.. These alterations and changes are set out in detail in finding-18.
About June 30, 1944, the plaintiff was served with notice-that the property would be released to plaintiff at midnight August 31, 1944. The Navy relinquished the use of the premises on September 1, 1944, but at that time they were-not in suitable condition for use by the plaintiff, and the-plaintiff refused to accept them in that condition.
There followed considerable negotiation and correspondence in reference to the matter. Representatives of the plaintiff and the defendant made a joint examination and report as to the condition of the buildings, fixtures and furnishings.. The plaintiff secured an estimate for doing certain restoration work on the buildings covering those items which had' not been agreed upon as between the plaintiff and defendant but the Navy refused to accept that estimate. An estimate was made by a representative of the Navy which was unsatisfactory to the plaintiff.
These negotiations continued until June 1945, when an agreement was reached between General Beaver, represent *781 ing the plaintiff, and representatives of the Navy on an amount to be paid the plaintiff on account of the restoration of the premises, the amount being $15,366.67. The plaintiff heard nothing further about the matter until July 31, 1945, when it received a draft of the proposed agreement, together with a letter to General Beaver. On August 6,1945, General Beaver replied stating that since he had heard nothing in the meantime he had assumed that the agreement was not satisfactory to the Navy, and he had since found that it would require a great deal more to restore the property than he had anticipated. General Beaver wrote the Navy another letter on August 20, 1945, further stating that the estimate was wholly inadequate. On September 19,1945, a representative of the Navy who had negotiated with General Beaver replied to the two letters of General Beaver in which he insisted that a settlement had been agreed upon. He sent a modified draft of the agreement but it was not executed by the plaintiff.
At that time, due to the shortage of labor and the uncertainty as to the price of materials, it was impossible to secure a firm contract for the restoration of the premises. The work of restoration was completed April 9, 1947. The plaintiff maintained a record of its expenditures, the total of which for the period September 1, 1944, to April 9, 1947, according to that record, was $47,127.67. This included the salary of the caretaker and utility bills.
The plaintiff also claimed that it was entitled to rent for the period September 1,1944, to January 1,1947; to damages to the athletic field, which it asserted had been allowed to deteriorate and grow up to weeds, in the amount of $2,500; to the cost of the contractor’s estimate as to the repairs, $352; the cost of reconversion of the rooms converted by the Navy into a hospital, amounting to $4,248. Its total claim amounts to $166,715.14.
The defendant asserts that there was a firm agreement that the expense of reconditioning was to be $15,366.67, and that if the agreement is not treated as binding, the actual cost should be limited to $9,605.
We are presented with an unusual situation. The de *782 fendant asserts that it is not bound by the original lease agreement for the payment of rental at the rate of $50,000 per year, notwithstanding the amount apparently was agreed upon, the keys delivered and accepted and the property taken over by representatives of the defendant. The plaintiff does not seek this additional rental for the period prior to the condemnation proceedings, but accepted the judgment of the district court covering not only the period prior to condemnation but that following the condemnation. The basis of the refusal of defendant to pay according to the original agreement was that such agreement was not approved by the Bureau of Yards and Docks which had authority to make a lease contract.
On the question of the estimate of the restoration costs, however, the defendant contends that it is a binding obligation notwithstanding the fact that plaintiff was a corporation ; that the authority which General Beaver possessed was the authority to recommend to the trustees or board of directors, and that they had rejected the agreement. Defendant claims that since General Beaver was president of the corporation and apparently had been the owner of the property he had authority to bind the corporation. Perhaps it thought the president as such had the inherent power to so bind the corporation.
We are not disposed to treat as final and binding either of these two agreements. The claims of both parties are somewhat extreme.
The defendant seeks to avoid the original agreement despite the fact that it was partly carried out. At the same time it seeks to hold as binding a tentative settlement agreement which was in almost exactly the same status. We do not believe that defendant should be permitted to thus show the cloven foot. Undoubtedly as the findings developed there was a much greater damage to the property in excess of ordinary wear and tear than was evidenced by the so-called tentative agreement.
The plaintiff is entitled to recover the amount necessary to restore the property, furniture and fixtures to the condition that existed at the time the property was taken over by *783 the defendant, reasonable wear and tear excepted, or in the alternative, the excess damage to the property over and above' that which might reasonably be termed ordinary wear and tear. In the circumstances of this case, both amounts would be substantially the same. The plaintiff is also entitled to recover rent for the period reasonably necessary for restoring-the property, which period we have found to be four months.
On the other hand, plaintiff is not entitled to recover on-anything like the basis of the figures presented. There would necessarily have been considerable wear and tear and essential repairs to the premises of this type of school. A boys’ school is not exactly a lace-curtain affair. Normally husky- and healthy American boys, even though they come from the best families, which plaintiff claims for its high-type school, are not primarily interested in using their spare time-for playing croquet or growing roses. Growing boys do not immediately, no matter what the atmosphere, get over their tendency to play rough at times, if for no other purpose than to demonstrate that they are not sissies. They are primarily interested in the more vigorous pursuits and when several hundred are together, it cannot be assumed that there-is not some considerable material damage and injury to buildings, furniture and furnishings.
We find that the fair and reasonable cost of restoring the-property of the plaintiff to the same or as good condition on¡ September 1, 1944, ordinary wear and tear excepted, as. existed on May 27,1942, was $22,500.
The fair and reasonable value as of September 1, 1944, of the items of furniture and equipment which were missing or damaged beyond repair, and also including damage to-other furniture and equipment over and above ordinary wear and tear during the period of the Navy’s occupancy, was-$6,000.
The Hollywood plant included an athletic field of approximately 15 acres which was improved for use for football,, baseball and track. During the period of the Navy’s occupancy little use was made by the Navy of this field. It was allowed to grow up to weeds and to deteriorate. The rea *784 sonable cost as of September 1,1944, of restoring the athletic field to the condition it was in on May 27, 1942, reasonable wear and tear excepted, was $2,500.
The amount of rental for the four months that were neces•sary within which to restore the buildings and grounds to the condition which existed May 27, 1942, reasonable wear ■and tear excepted, was $14,666.67. Spreckles v. United States, 63 C. Cls. 64.
The plaintiff is entitled to recover of the defendant the ■aggregate of these amounts, or $45,666.67.
Plaintiff claims that it is entitled to interest on the amount necessary to restore the property to its condition as of May ■27,1942.
If the plaintiff were suing for the rents during the period he would be entitled to interest on the items of rents as they accrued. But these have been adjusted and paid. “Here the damage was physical, measured in terms of cost of repairs and restoration. It was an unliquidated demand. The mandate of the Fifth Amendment does not * * * require an award of interest.” United States v. 37.15 Acres of Land, 77 F. Supp. 798, 805.
Ordinarily the rent for the four months which we have •found were reasonably necessary within which to repair the premises would bear interest dating from the time of accrual ■of such rents. However, in the peculiar circumstances of this case, that period was wholly indefinite and could not be ■definitely determined before final judgment.
Plaintiff would be entitled to interest on any items of furniture that were permanently taken. But missing items, worn out items, excessively damaged items and somewhat •damaged items were so intermingled as to make this entire feature an unliquidated damage claim. It is not disclosed by the evidence that any furniture was intentionally appropriated.
We are not permitted to allow interest on any of these items of recovery.
Howell, Judge; Maddest, Judge; Whitaker, Judge; and BittletoN, Judge, concur.