**AMERICAN CHEMICAL SOCIETY**

v.

**The UNITED STATES.**

No. 68–68.

United States Court of Claims.

Feb. 19, 1971.

Arthur B. Hanson, Washington, D. C., attorney of record, for plaintiff. Ralph N. Albright, Jr., Washington, D. C., of counsel.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 17, 1970. On December 18, 1970, plaintiff filed a "Motion for Judgment" wherein it moved that the court adopt the commissioner's findings of fact, opinion, and recommended conclusion of law as the basis for its judgment in this case. On December 18, 1970, defendant filed a response stating that it has no objection to plaintiff's motion of December 18, 1970.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff's said motion and adopts the said opinion, findings and recommended conclusion as the basis for its judgment in this case without oral argument. Therefore, it is concluded (1) that plaintiff is entitled to recover $77,400 and judgment is entered for plaintiff in this amount, and (2) that plaintiff is entitled in addition to a sum computed for performance of the entire contract in accordance with the formula described in finding 23 (less the aforementioned sum of $77,400), the amount of such additional recovery to be determined in further proceedings pursuant to Rule 131(c) (2).

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

This is an action on a contract between plaintiff American Chemical Society (hereinafter "Society"), and defendant acting through the National Science Foundation (hereinafter "NSF"). The Society is a nonprofit scientific and educational membership corporation, the largest and most prestigeful organization for chemists in the United States. Originally organized in 1876, it sought and obtained a charter from Congress in 1938 in the belief that it could thus more effectively carry on its work. The House Report which underlies its

charter described it then as the largest organization in the world devoted to science, including among its members. Nobel prize winners, university presidents, heads of prominent chemical industries, leading research and industrial chemists, and leading chemists in Government.

By further way of description, House Report No. 1508 (August 11, 1937), observed that:

> The society has always given freely of its time and services and its loyalty and active cooperation with the Government of the United States both in war and peace times * * *. Without this service Government bureaus and agencies engaged in many kinds and descriptions of chemical research and control, including the application of chemical knowledge to the improvement of life and health in America, would be functioning without their most important tool.

> The society abstracts and indexes all papers on chemistry published throughout the world in any language. Its index is a key that makes this great fund of knowledge, taken from more than 2,900 publications, promptly available to all American chemists. No agency of the Government is either equipped to do this work or supplied with funds for the purpose, and these abstracts are always available and are used in every Government, State, municipal, and industrial laboratory and are furnished to all at approximately one-half of the cost of production by means of contributions made by American chemists.

Its Act of Incorporation provides in part as follows:

> Sec. 2. That the objects of the incorporation shall be to encourage in the broadest and most liberal manner the advancement of chemistry in all its branches; the promotion of research in chemical science and industry; the improvement of the qualifications and usefulness of chemists through high standards of professional ethics, education, and attainments; the increase and diffusion of chemical knowledge; and by its meetings, professional contacts, reports, papers, discussions, and publications, to promote scientific interest and inquiry, thereby fostering public welfare and education, aiding the development of our country's industries, and adding to the material prosperity and happiness of our people.

All of the revenue of the Society is obtained from membership dues, subscriptions to its numerous journal and abstract publications, sale of advertising in these publications, and from cost-type, no-profit contracts with the Government and other organizations. The Society also engages in research and development activities funded partially by its subscription income, and partially by Government grants.

The Society abstracts literature of the world dealing with the science of chemistry, regardless of its source or language and undertakes to make such information available to the public and scientific community. Abstracting functions are accomplished through one of its operating divisions, the Chemical Abstracts Service (hereinafter "Service"). This is a highly useful service, and it is observed that the Soviet Union, for example, has developed a system patterned after this which includes the full range of science and technology, and is not limited to chemistry.

During 1963, research carried out by the Service and financed entirely by the Society with its own funds, had led to the initial development of a computer-based registry system for identifying chemical structures. It became apparent that this development might have considerable use within the worldwide scientific and technical community. Under the proposed system, chemical compounds are assigned identifying numbers comparable to those, for example, in the social security system. The numbers in effect became "address-

es" within an identification system. The structural diagram of a particular chemical compound is the medium of identification and the Society had developed a system for feeding the diagram into a computer and manipulating it into a unique form, thereby permitting routine identification without the substantial intellectual effort that had been required prior to this development.

A number of Government agencies which depended upon chemical recognition, and with major investment in computers, were interested in this project. They included health agencies, regulatory agencies, and the Department of Defense. The Service had concluded that it could no longer finance the development with its own funds. Three Government agencies (Department of Defense, Department of Health, Education and Welfare, and the National Institutes of Health), instituted discussions under the auspices of the President's Office of Science and Technology, regarding further implementation of such a registry network. As an outgrowth of these discussions, funds were transferred from the named cooperating agencies to the NSF for the express purpose of promoting research leading to the eventual development of a large-scale national registry system.

The NSF is an independent agency of the United States, established by the National Science Foundation Act of 1950. It awards contracts to nonprofit institutions in furtherance of its fundamental purpose of strengthening basic research and education in the sciences, and developing new and improved methods of making scientific information available. The Society had performed prior work for NSF. For example, beginning in 1954, the Society had been under a 2-year renewable contract to conduct the National Register of Scientific and Technical Personnel which keeps an up-to-date record on the chemical scientists in the United States. Under this contract, the Society itemizes all expenses as they occur and is reimbursed accordingly. By way of further example, in 1958 NSF had begun funding the Society through a grant mechanism to develop a chemical information program which was the forerunner of the development by the Society with its own funds of a computer-based registry system, described above.

The grant system had proven unsatisfactory because it permitted the Society to recover only up to 20 percent of its contract overhead, and the Society found it could not support the remainder of this expense. As a result, in 1964, both parties concluded that they would thereafter operate on a contract basis, permitting reimbursement to the Society of all of its costs, without profit. The costs referred to contemplated all costs of accomplishing the work, including the housing of the staff performing the work.

In the years preceding the contract involved in this case, the Service had occupied a building half-owned by the Society and half-owned by Ohio State University. It was located on University property. Because it was being outgrown as the staff rose from 345 to 1,000, the building had been supplemented by rented quarters at four locations in the immediate vicinity. These rental costs had been reimbursed by NSF as contract costs, without question.

The growth above described was the direct result of the research and development work supported by grants and contracts, mainly from NSF. The Society decided to meet its long-range needs for the Service by constructing new and larger quarters instead of renting additional needed space. Accordingly, it purchased a tract of land adjacent to the University, with which it cooperated in many ways. The land was purchased with Society funds in the amount of $675,000. Ground was broken in 1963, and the total cost of construction, including preparation of the land, and the furnishings, was $7.3 million. It was financed entirely by

Society funds in the total amount of $2.3 million, plus a mortgage loan on the building taken out by the Society in the amount of $5 million. The Society could not have paid cash for the entire cost of construction without jeopardizing its other operations.

It is reimbursement of a proportionate share of the mortgage interest allocable to the contract hereinafter described which is the subject of this litigation.

The Service moved into its new building January-February 1965, and preliminary negotiations for a contract to develop the earlier described computer-based registry system began in 1965. As was the practice of the Society in its Government contracting, this contract was to be at cost without profit.

The Society's representatives made it clear to the Government's representatives that recovery of its actual costs or expenses for performing the contract would have to include an appropriate portion of mortgage interest expense on the new building, to the extent allocable to this contract. This was clearly understood throughout the negotiations. For example, the Chairman of the Board of the Society, speaking for the Board, stated unequivocally that the Society could not, and would not, enter into the contract if it had to absorb any costs, that is, unless the interest costs allocable to contract performance would be recovered. Government representatives at these negotiations concurred in the reasonableness of this request because they agreed it was an actual cost to the Society.

The parties were aware of Federal Procurement Regulations and the part dealing with cost principles which state, inter alia, that interest on borrowings is unallowable in the case of a cost reimbursement type of contract. At the time the contract was executed, the NSF was not governed by the Federal Procurement Regulations, but was utilizing them as a guide. The Government negotiators believed that they could list this mortgage interest as a reimbursable cost, since deviation from the cost principles on a case-by-case basis was permissible. The General Counsel's office of NSF concurred in this proposed treatment of the interest cost, but the agency's comptroller preferred that it be handled separate and apart from costs and as a "fixed fee." The Director of NSF (who also felt that all of the Society's actual expenses including allocable mortgage interest should be reimbursed), resolved this conflict of procedure by concluding that mortgage interest expenses should be expressed as a fixed fee, and that is the way the contract was drafted.

It is a cost-plus-fixed-fee type of contract dated June 1, 1965. Under its terms the Society was to develop an experimental computer-based registry system for recording, identifying and filing detailed structural descriptions of chemical compounds and to conduct research and development in selected information handling problems. Total costs, exclusive of the fixed fee (mortgage interest), were initially estimated to be $1,974,000.

Section C of the contract, "Estimated Cost," provides in part that:

3. As full consideration for performance of the work under this contract, the Contractor shall be reimbursed for its direct and indirect costs as hereinafter provided, *and* shall be paid a *fixed fee of $69,400.* [Emphasis supplied.]

Section D, "Compensation," dealing only with reimbursement of direct and indirect costs, provides in part, that:

The cost of performance of this contract is defined as the costs of the necessary direct items of the nature described below as direct costs, and an amount for overhead determined in accordance with the Article of this contract entitled "Negotiated Overhead Rates." Allowability of costs and cost allocation methods shall be determined in accordance with Sub-

part 1–15.2 of Part 1–15 of the Federal Procurement Regulations.

The method used in calculating the proportion of mortgage interest (fixed fee) allocable to this contract, was as follows:

In each department in which contract work was performed, a ratio was developed of contract direct labor cost to total direct labor cost for that department, and the amount of floor space devoted to the contract was computed from that ratio. These segments of departmental floor space were totaled, and the ratio of that space to the overall floor space of the building was established. This ratio was used to determine the proportion of the annual incurred interest expense allocable to this contract.

A total of 11 amendments to this contract were executed by the parties. Through amendment No. 6 dated January 20, 1967, the estimated total cost had been increased to $3,018,600 and the fixed fee (mortgage interest) had been increased to $106,450 to correspond with these enlargements in the scope of the contract. The total amount of fee thus authorized was not however actually paid. As a matter of fact, the sum of $77,400, which had theretofore been actually paid, was required to be refunded by reason of an opinion of the Comptroller General of the United States dated February 24, 1967, as hereinafter detailed.

On April 19, 1966, in response to an inquiry from the Assistant Secretary for Administration of the Department of Health, Education and Welfare, the Assistant Comptroller General of the United States had expressed the opinion (in connection with another but similar contract), that "while such interest is, of course, an expense to the society, it is not so related to the contract work in question as to constitute part of the 'actual expense' incurred in connection therewith. We recognize that a precise meaning to fit all cases cannot be ascribed to the term

'actual expense.' However, we believe it is sufficiently descriptive to exclude an item of cost to the society which relates to the financing of its real properties acquired separate and apart from any involvement in contract work the society undertakes to do at actual expense." The use by the Assistant Comptroller General of the term "actual expense" apparently resulted from his examination of the Society's charter (not its contract), section 4 of which provides:

> That the American Chemical Society shall, whenever called upon by the *War or Navy Department,* investigate, examine, experiment, and report upon any subject in pure or applied chemistry connected with the national defense, the *actual expense* of such investigations, examinations, experiments, and reports *to be paid* from appropriations which may have been made for that purpose by Congress, but the society shall receive *no compensation* whatever for any services to the Government of the United States * * *. [Emphasis supplied.]

Being aware of this opinion of April 19, 1966, the Deputy Director of NSF addressed a letter to the Comptroller General on November 29, 1966, asking his opinion regarding payment to plaintiff of a proportionate share of its mortgage interest expense on this contract, wherein it is expressed in the form of a fixed fee, as above outlined. The NSF letter strongly urged that this mortgage interest should be payable in accordance with the contract terms. It observes that it certainly is an "actual expense" and "must be recovered in some fashion if the Society is not to suffer a loss." It goes on to explain that even in contracts for profit, where it is provided under the contract terms that interest on borrowings is unallowable as a direct cost, it is the very purpose of the fixed fee in such cases to provide a vehicle for recoupment of such "unallowable" costs, because the parties recognize them as "actual expense" which must be recovered. In this case

mortgage interest absorbs the entire fee because the fee is actually computed to reflect mortgage interest, and nothing else. The NSF observed that Congress never intended the Society to subsidize work performed for the Government, and that if it cannot recover its "actual expense," the Society's members and subscribers are forced to subsidize the Government's work.

There followed the Comptroller General's opinion of February 24, 1967, earlier mentioned. He acknowledges therein that "as a rule of statutory interpretation the subsequently promulgated cost principles contained in * * the Federal Procurement Regulations would not necessarily be determinative of the question of whether mortgage interest was an 'actual expense' within the meaning of section 4 of the society's incorporating act. * * * Our decision, however, was not predicated on that cost principle."

He concludes that the term "actual expense" would not include mortgage interest, because "mortgage interest on this building, while admittedly a cost to the society, did not accrue because of the contract or the NIH contract; it is payable by the society in any event and is clearly attributable to the society's usual operations rather than to the fact of contracting with the Government." The Comptroller General further expresses the opinion that "in regard to the use of a CPFF contract, it is even more evident that an element of profit is present. The CPFF form of contracting provides the contractor with a guaranteed profit, which, unlike the profit element in a fixed-price contract, does not depend upon the contractor's ability to control costs. Moreover, the provision for a *guaranteed predetermined profit* in a CPFF contract is the only factor which distinguishes this form of contract from a firm fixed-price or cost-type contract." Reasoning that this therefore represented profit to the Society, contrary to its charter, the Comptroller General states that "appropriate action should be taken to

eliminate the fixed-fee obligation from the contract and to recover the fixed-fee payments erroneously made to the society."

Although earlier in his opinion he had acknowledged that Federal Procurement Regulations were not necessarily determinative and that the decision was not predicated thereon, the Comptroller General does conclude that "the Foundation has entered into a reimbursement-type contract which provides for the recovery of interest on borrowings under the guise of a fixed fee. This, we believe, is contrary not only to section 4 of the statutory charter of the society but to the Federal Procurement Regulations."

The Society, on May 17, 1967, asked the Comptroller General to reconsider his decision, observing that the Federal Procurement Regulations are not applicable to section C of the contract dealing with the fixed fee, and that it was the clear intent of both parties that the Society recover an appropriate share of its interest expense as a fee, if it were not to suffer a loss. This request for reconsideration was denied by the Assistant Comptroller General in letter of July 7, 1967, in which he had this to say:

Initially, we would point out that our previous decisions clearly acknowledged the fact that the society's long-term financial obligations with respect to its real property are certainly costs. Apart from consideration of the effect of the Federal Procurement Regulations on the society's contractual arrangements with NSF, we do not suggest, in reference to the cases cited by you, that the payment of interest on borrowings would, in every case, be improper under section 4 of the society's charter. However, in our opinion, the language of the charter and the legislative history thereof contemplate the payment of compensation for costs resulting directly from the fact of contracting with the Government.

The Assistant Comptroller General acknowledged generally the correctness of plaintiff's observation that the Federal Procurement Regulations are not applicable to section C of the contract dealing with the fixed fee, but he stated:

\* \* \* However, as we previously indicated, under the Federal Procurement Regulations the "fee" in a CPFF contract conceptually requires a conclusion that the "fee" provided a profit to the society in contravention of section 4 of the charter act. See 39 Comp.Gen. 71. Further, even if we could agree that the "fee" in the CPFF contract may not contain an element of *guaranteed predetermined profit*, we can see no reasonable basis for not affirming our prior conclusion that the "Foundation has entered into a reimbursement-type contract which provides for the recovery of interest on borrowings under the guise of a fixed fee."

By letter dated May 3, 1967, following the first decision of the Comptroller General, the NSF requested from the Society return of the $77,400 theretofore paid as a fixed fee representing mortgage interest, and on May 19, 1967, the Society returned the stated sum under protest. Consistent therewith, and also under protest, contract amendments following No. 6 did not reflect fixed fee to correspond with subsequent enlargements in the scope of the contract.

During the life of the contract, costs of ownership of the building other than mortgage interest, such as depreciation and operating costs, were reimbursed as direct costs under the terms of the contract and without question. Also, during the period prior to acquisition of this building, as earlier mentioned, the cost of rent allocable to plaintiff's staff engaged in the performance of this type of contract, had been reimbursed without question as a cost of performance.

The foregoing facts are supported by a stipulation, supplemented by a trial at which five witnesses were presented, all of them by plaintiff. No witnesses were offered by defendant. Of the five witnesses presented by plaintiff, three were employed by plaintiff, and two by defendant. Their testimony is entirely consistent on the intent of the parties during the negotiation, execution and performance of this contract. That intent was that mortgage interest was recognized as an actual expense to plaintiff; that the fixed fee was negotiated to correspond to a proportionate share of that mortgage interest, and not as a profit; that both parties at all times intended that plaintiff recover the proportionate share of mortgage interest allocable to this contract; and that the Society in accordance with its long-standing policy had in no way attempted, even remotely, to realize, nor had it realized, any profit from performance of this contract.

This case did not develop under the Standard "disputes" clause, although one is contained in the contract. No contracting officer's decision, nor appeal, therefore, preceded the filing of the petition in this court, the claim having developed as outlined above. In any event, defendant has waived any right it might have to have this claim first processed under the disputes clause, in order to obviate any question on the point.

The Comptroller General is not a party to this contract, nor is he nor his office (General Accounting Office) anywhere mentioned therein. This opinion does not deal with whether or not he has statutory authority to affect compliance with the contract on the basis of his independent interpretation of plaintiff's charter,[1] nor does it deal

---

1. *See*, for example, United States v. Mason & Hanger Co., 260 U.S. 323, 43 S.Ct. 128, 67 L.Ed. 286 (1922); United States ex rel. Brookfield Construction Co. v. Stewart, 234 F.Supp. 94, 100 (D.C.1964), and James Graham Mfg. Co. v. United States, 91 F.Supp. 715 (D.C.1950).

with the included issue of whether the NSF is embraced within the phrase "War or Navy Department" in the section of the charter relied upon. It is a fact, nevertheless, that this case has resulted from the opinions of the Comptroller General, summarized above, and the court in this action for breach of contract must therefore deal with them.

It is so basic a tenet of contract law as to require no citation, that each party is entitled to compliance by the other party with the plain terms of their agreement, unless it is palpably illegal.[2] This contract for a public service, between a nonprofit scientific and educational membership organization of chemists, and a Government agency charged with strengthening basic research and education in the sciences, is palpably not illegal.[3] Nor is it illegal in form. The cost-plus-fixed-fee form of contract was developed by the Government, and has long and regularly been employed by it in procurement.

The simple fact that puts this case at issue, is that the contract and its amendments plainly call for payment of a fixed fee—and it has not been paid. The NSF, with apparent reluctance, has declined to observe this provision of its contract because of the opinions of the Comptroller General reviewed above, opinions which variously contend that the fixed fee should not be paid (and that partial amounts already paid should be recovered) because (1) although the mortgage interest is an expense, it is not an "actual expense"; (2) it is a profit; and (3) it is a cost of the type declared unallowable in the cost principles contained in Federal Procurement Regulations. These contentions are considered in turn.

The argument that "while such interest is, of course, an expense to the Society, it is not so related to the contract work in question as to constitute part of the 'actual expense' incurred in connection therewith," is apparently based on the feeling that it would have been incurred anyway. Supposedly the same argument could have been made with respect to rent incurred for housing the Society's staff, some of whom were engaged on prior, similar contracts; or with respect to other building ownership costs incurred on this contract, such as amortization and building operating costs; or with respect to the salaries of staff who would haver emained on the payroll even if this contract had not been undertaken. But such arguments have, of course, not been made and could not logically be made, and the described expenses have been reimbursed without question. This is because they are readily recognized under generally accepted accounting principles as costs or expenses reimbursable to the extent allocable to a particular contract. It is therefore not valid to attempt to distinguish mortgage interest, on the ground that it would probably have been incurred anyway.[4]

2. "A bargain is illegal within the meaning of the Restatement of this Subject if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy." Restatement of the Law of Contracts, Vol. II § 512.

3. *Cf.* United States v. Acme Process Equip. Co., 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed. 2d 249 (1966), and United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

4. In his opinion on reconsideration, the Assistant Comptroller General admitted that "we would point out that our prev-

ious decisions clearly acknowledged the fact that the society's long-term financial obligations with respect to its real property are certainly costs. Apart from consideration of the effect of the Federal Procurement Regulations on the society's contractual arrangements with NSF, we do not suggest, in reference to the cases cited by you, that the payment of interest on borrowings would, in every case, be improper under section 4 of the society's charter."

Although not necessary to this opinion in the light of generally accepted accounting principles, it is noted that there is uncontradicted testimony that the Society

The second contention that "as we previously indicated, under the Federal Procurement Regulations the 'fee' in a CPFF contract conceptually requires a conclusion that the 'fee' provided a profit to the society * * *," is equally invalid. There is not a scintilla of evidence in this record that a profit was realized on this contract. Because the fixed fee in a CPFF contract characteristically includes (among other things) the profit element in a contract contemplating profit, the opinion assumes that it always and exclusively represents a profit. This is not true. As stated in Nash, *Pricing Policies in Government Contracts,* 29 Law & Contempt.Prob. 361, 368 (1964): "Another aspect of the determination of estimated costs is the problem of disallowed costs. It has been the policy of the government to disallow certain costs under cost reimbursement contracts in order to achieve uniformity of treatment of such costs by removing the need for individual consideration of their merits on a case-by-case basis. Such disallowed costs include * * * interest and financing costs, as well as many other costs. * * * However, to the extent these costs are necessary business costs, nonallowance of these costs is merely a profit reduction device. * * * Hence, every contractor must discount the negotiated profit on a contract by some amount to reflect these unallowable costs." [5]

In this case, as the facts clearly demonstrate, the fee was specifically negotiated to represent mortgage interest expense, and nothing else. The fee is completely absorbed by mortgage interest expense, and includes nothing for profit.

Finally, while acknowledging that "the subsequently promulgated cost principles contained in * * * the Federal Procurement Regulations would not necessarily be determinative of the question of whether mortgage interest was an 'actual expense' within the meaning of section 4 of the society's incorporating act * * *" and that the decision "was not predicated on that cost principle," the Comptroller General nevertheless contends that reimbursement would be contrary to the Federal Procurement Regulations. This contention also lacks validity.

Interest is not universally disallowable. As previously observed, it is reimbursable or recognized as a cost or expense in many different contexts, and the Comptroller General's opinions "do not suggest * * * that the payment of interest on borrowings would, in every case, be improper." The NSF, when seeking a favorable opinion from the Comptroller General in this case, pointed out that even the cases cited by the Assistant Comptroller General in his earlier opinion of April 19, 1966, acknowledge recovery of interest out of profit. Moreover, interest is regularly recovered as part of an "equitable adjustment," or in the price redetermination of fixed-price contracts.[6] It is declared

did have this contract in mind while constructing its building. The plan to lease one full floor to be furnished by the lessee, was abandoned and the Society supported that floor at its own expense for about 5 months in anticipation of this contract.

Note also that interest, for federal income tax purposes, is generally allowable as a deduction under the Internal Revenue Code, as well as under the Renegotiation Act.

5. The author cites the testimony of Mr. Graeme Bannerman, Deputy Assistant Secretary of Defense (Procurement) to

the effect that many companies figure that such disallowances run from 2 to 4 percent of total costs. Hearings on Systems Development and Management Before a Subcommittee of the House Committee on Government Operations, 87th Cong., 2d Sess., pt. 2 at 553 (1962).

6. *See,* for example, Bell v. United States, 404 F.2d 975, 984, 186 Ct.Cl. 189, 205 (1968); Phillips Constr. Co. v. United States, 374 F.2d 538, 179 Ct.Cl. 54 (1967); E. I. Du Pont De Nemours & Co. v. Lyles & Lang Constr. Co., 219 F.2d 328 (4th Cir. 1955): Aluminum Specialty Co., ASBCA No. 6228, 1963 BCA ¶

"unallowable" in the cost portion of a cost-reimbursable type contract, probably for the policy reasons stated in the above cited law review article.[7] In any event, as outlined above, the parties to this contract fully and openly recognized this potential problem, considered treating it as a permissible deviation from the cost principles, and concluded that it should instead be set forth in the "fixed fee" portion of the contract. The Comptroller General acknowledges, as indeed he must, that the voluntarily incorporated cost principles apply only to the cost portion of the contract (section D). They cannot and do not purport to preclude payment of the fixed fee specified in section C.

The foregoing considered, it is concluded that plaintiff is entitled to judgment in the amount of $77,400, that sum having been returned by it under protest at the request of defendant, as earlier explained. Plaintiff is further entitled to recover the additional sum computed for performance of the entire contract in accordance with the formula described in finding 23 (less the aforementioned sum of $77,400), the amount of such additional recovery to be determined in further proceedings pursuant to Rule 131(c) (2).

Plaintiff further seeks interest on this recovery as an exception to 28 U.S.C. § 2516(a) (1964), on the grounds that "where the government wrongly takes property, as here, it is well established principle that the injured party is entitled to interest as an element of damage and just compensation."[8]

There is no support for a holding that the events above described constituted a taking,[9] and plaintiff is not entitled to prevail on the claim for interest on the amount of recovery.

---

3859; Q. V. S., Inc., ASBCA No. 7513, 1963 BCA ¶ 3699; Rainier Co., ASBCA No. 3565, 59–2 BCA ¶ 2413; and National Electronics Laboratories, Inc., ASBCA Nos. 2909, 3180, 57–1 BCA ¶ 1247 at 3662.

7. At note 5 *supra.* It has been suggested that the policy of disallowing interest as a cost where that policy is directly applicable, was probably not intended to preclude reimbursement of mortgage interest, because this creates a negative incentive for Government contractors to own prop-

erty, and an incentive to rent instead. Ownership costs, including mortgage interest, are ordinarily less than rent, since the latter includes all of the owner's costs, plus a profit.

8. Citing Carlstrom v. United States, 177 F.Supp. 245, 147 Ct.Cl. 297 (1959), and Riverside Military Academy, Inc. v. United States, 122 Ct.Cl. 756, 784 (1952).

9. *Cf.* J. L. Simmons Co. v. United States, 412 F.2d 1360, 1387, 188 Ct.Cl. 684, 731 (1969).