## BLUE CROSS ASSOCIATION
v.
## The UNITED STATES.
### No. 530–71.

United States Court of Claims.

Feb. 16, 1973.

Barron K. Grier, Washington, D. C., attorney of record, for plaintiff. Clarence T. Kipps, Jr., John L. Rice and Miller & Chevalier, Washington, D. C., of counsel.

William A. Mogel, Bethesda, Md., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant. Ray Goddard, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on

June 23, 1972, wherein such facts as are necessary to the opinion are set forth. A request for review by the court of the commissioner's report and opinion was filed by defendant and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied and judgment is entered for plaintiff in the sum of $1,598.

### OPINION OF COMMISSIONER

SPECTOR, Commissioner:

Plaintiff is the well-known nonprofit corporation which provides prepaid hospital and medical protection to its subscribers across the nation. On January 7, 1966, it entered into a cost-reimbursable (no profit) contract with the Department of Health, Education, and Welfare (HEW) which requires plaintiff to administer and facilitate payments under Title XVIII of the Social Security Act (popularly known as the Medicare program). At issue is the sum of $1,598, the portion allocable to this contract of a $9,750 payment in 1967 by plaintiff's subcontractor to the Regional Hospital Planning Program of the Columbus Hospital Federation [1] (hereinafter the Federation).

Article XIV of the contract authorized plaintiff to enter into subcontracts for the performance of some of the functions required of plaintiff. The aforementioned subcontract is with Blue Cross of Central Ohio at Columbus, and it provides for daily administration of the Medicare program in central Ohio. The subcontract, which is also on a cost-reimbursable, no profit basis, was duly approved by the Secretary of HEW.

Blue Cross of Central Ohio similarly provides a plan for prepaid hospital care consistent with sound business and actuarial principles, to assure adequate health care facilities and to encourage the provision of health care at the lowest possible cost. Under its plan it has contracts with hospitals, extended care facilities and home health care facilities within its 29-county service area. As we all know, a Blue Cross subscriber pays a subscription charge or premium, and when care is provided him, Blue Cross reimburses the hospital its approved charges, not to exceed audited costs. Similarly, care rendered to Medicare patients is reimbursed on a cost basis. It is obvious that it is in the best interests of all concerned, that is, the general subscribers, Medicare patients, plaintiff and defendant herein, that such costs be kept to a minimum consistent with proper care.

Under its contract with HEW, plaintiff specifically undertook to make determinations of the amounts of payments required to be made on a reasonable cost basis to each institution, facility or agency designated to provide service under the Medicare program; to receive, disburse and account for funds in making such payments; to make audits of the records of providers of services; and to make such management studies as might be necessary to insure effective performance of the contract.

Still more specifically as it bears on this claim, Article II. D. of the contract requires plaintiff, for example, to:

*Assist providers of services* in the development of procedures relating to utilization practices, make studies of the effectiveness of such procedures and methods for their improvement, *and assist* in the application of safeguards against unnecessary utilization of services. [Emphasis supplied.]

The Federation, to which the aforementioned payment of $9,750 was made by Blue Cross of Central Ohio, is also a nonprofit corporation, governed by a 56-man board of trustees. Services rendered by the Federation include regional

---

1. Now known as the Mid-Ohio Planning Federation.

planning of hospitals, home health care agencies, extended care facilities, clinics, and the conduct of studies pertaining to health facilities and services in the same general area in which Blue Cross of Central Ohio conducts its business. It provides planning services for the development, timing and location of facilities, manpower and health services.

The overall budget of the Federation is allocated to each of the 17 counties which it serves. Each county has a local planning council which has the responsibility of raising its proportionate share of that budget. The money is raised by each county from hospitals, extended care facilities, business, industry and individuals. A portion of these requirements is specifically allocated to Blue Cross of Central Ohio.

In the year here in question, 1967, Blue Cross paid the exact amount allocated to it, and it had made similar payments on an annual basis from 1960 throught 1970.[2] Money raised for its operations by the Federation is matched on approximately a 50–50 basis by HEW under a grant, which is not related to this lawsuit. It is, however, a condition of this grant that "these local monies must come from a broad spectrum of the community both public and private as evidence of the community's acceptance of the program."

The payment made by Blue Cross to the Federation in 1967 was specifically earmarked for the *planning* function of the Federation.[3] The amount of the payment was distributed or allocated by Blue Cross as a general cost of doing business to all of its activities, including this contract and services provided to general subscribers. The allocation resulted in a charge to the Medicare program of the aforementioned sum of $1,598. Claim for reimbursement under

this cost-reimbursable contract was denied by the defendant's contracting officer, and on appeal to the head of the department under the contract disputes clause, by the Armed Services Board of Contract Appeals.[4] It has been denied on the ground that it is a "contribution or donation," and therefore unallowable as a cost under the regulations governing this contract.

Facts underlying this case are virtually undisputed. The issue is whether reimbursement of the above sum to plaintiff is legally prohibited, an issue to which this court is privileged to address itself *de novo*.[5]

■ The board opinion is exemplary in its detail and objectivity. It reflects an unmistabable reluctance in reaching its result, and that reluctance is understandable. On these facts, and for the reasons following, it is concluded that the board was in error in characterizing the payment at issue as a charitable contribution of the type currently declared unallowable by the regulations.

In distributing this payment to the Federation as a general cost of doing business, Blue Cross of Central Ohio recognized that it was in its *business* interest (and in the interest of its subscribers and the Government) to assure that hospital and similar health facilities are not developed prematurely or in a manner unrelated to needs. If a facility has excess beds, for example, the per patient cost of operating the facility is higher than necessary, and required reimbursements by Blue Cross, including payments made for Medicare patients under this contract, are correspondingly higher than necessary.

The Federation has, *at the specific request of Blue Cross,* undertaken projects aimed at the consolidation of existing

---

2. With the exception of 1961.

3. *See* Article II. D. of the contract, above-quoted.

4. The ASBCA has been designated by the Secretary of HEW to hear and determine appeals for him.

5. *Cf.* American Chem. Soc'y v. United States, 438 F.2d 597, 603–604, 194 Ct.Cl. 370, 382–383 (1971). *See also* J. W. Bateson Co. v. United States, Text and citations at n. 7, 450 F.2d 896, 899, 196 Ct.Cl. 531, 538 (1971).

facilities, thereby achieving greater economy in health services. For example, the Federation made numerous studies of two hospitals in Guernsey County, Ohio, at an estimated cost in excess of $20,000. In that county the "loss ratio" was 137 percent, meaning that claim costs were $1.37 for every $1 of income. In two contiguous counties, the loss ratio was well below 100 percent, and the average cost per case well below that at the Guernsey County hospitals. Blue Cross had been unable to convince appropriate officials that a merger of these hospitals was desirable to avoid an excess of beds, duplication of services, and questionable utilization practices. But in 1966 and 1967, the Federation accomplished a merger of these institutions with a consequent favorable impact on costs billed to Blue Cross, and resultant savings to regular subscribers and Medicare patients. Similar benefits were achieved in Gallipolis, Ohio.

Federation activities have also beneficially impacted upon other medical administration areas, with similar cost savings to Blue Cross and its subscribers and to Medicare patients. The latter cost savings obviously benefit the Government which underwrites the Medicare program. In some cases, new hospitals were not built after the Federation through its planning function was unable to document the need for additional beds at that time. In other instances, studies established the need for less expensive extended care facilities, in lieu of more hospital beds. Federation studies have resulted in closure of maternity sections in whole or in' part, in favor of other hospital needs, thus providing the double benefit of eliminating wasted space, while providing needed additional space without the cost of new construction.

Generally, the Federation has successfully prevented the duplication of expensive, specialized services by hospitals, brought about sharing of facilities, and promoted centralized purchasing. All of these functions are services which Blue Cross would have to undertake (on a cost-reimbursable basis so far as this contract is concerned), if the Federation were not available. Significantly, the record demonstrates that Blue Cross could not perform some of these functions as effectively as the Federation, nor is it capable of performing other of these functions at all. The board opinion states:

> * * * The president of Blue Cross of Central Ohio was of the opinion that withdrawal of his organization's financial support to the Federation would have had a "tremendous impact" on payments from other organizations, as others would have questioned the propriety of giving their financial support to a body that had been refused any financial support by the organization that stood to benefit the most from the Federation's activities. There is no way of knowing just what effect Blue Cross' withdrawal of financial support would have had on the Federation's activities and the benefits derived by Blue Cross from such activities, *but it appears to be unrealistic to assume that the Federation would have continued to render health planning services in conformity to the needs of Blue Cross if Blue Cross had withdrawn its financial support to the Federation.* [Emphasis supplied.]

As a matter of fact, the board decision states at the outset:

> It is hard to imagine *a stronger case* for treatment of a payment or contribution to a charitable organization [6] *as an allowable cost of performance of a Government contract.* The services rendered by the Federation *were necessary to the overall operation of the business of Blue Cross* and benefited both the Government contract and Blue Cross' other activities. *Such services reduced*

---

6. This characterization of the "payment" as a "contribution to a charitable organization," begs the question to be decided in this case.

*the costs incurred in the performance of the Medicare contract.* Although the payment made by Blue Cross to the Federation was not made by contract or as a *quid pro quo* for services rendered, *the payment had the effect of enabling Blue Cross to obtain the necessary cost-reduction services that could not have been obtained as effectively and economically in any other way,* and it is unlikely that Blue Cross could have obtained the services it needed from the Federation without providing financial support to the Federation. [Emphasis supplied.]

In other words, the record and board opinion establish overwhelmingly that this payment to the Federation produced *cost reductions which were a necessary part of the business of Blue Cross, and which produced direct cost benefits* under this Medicare contract with the Government. By way of further example in the record, if the length of stay in hospitals where Blue Cross conducts its business increased one-tenth of a day, the cost to Blue Cross for its subscribers would be in excess of $500,000 annually.

The board reasons to a negative result in the following manner. It states quite correctly that the pertinent Federal Procurement Regulations are incorporated in the contract. It recites section 1–15.-201–4 "Definition of allocability" in pertinent part as follows:

A cost is allocable if it is assignable or chargeable to a particular cost objective, such as a contract, product, product line, process, or class of customer or activity, in accordance with the relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a government contract if it:

(a) Is incurred specifically for the contract;

(b) *Benefits both the contract and other work,* or both Government work and other work, *and can be distributed to them in reasonable proportion to the benefits received;* or

(c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown. [Emphasis supplied.]

It is conceded by the board "that the payment to the Federation meets the indirect cost allocability tests of [the above-quoted] FPR 1–15.201–4, in that the payment to the Federation directly benefited the contract with HEW for Medicare services and the payment to the Federation was necessary to the overall operation of the business." [7] But the board concludes that this is a "general" provision which must give way to a "specific" provision, and it finds that FPR 1–15.205–8 is such a specific provision and, moreover, applicable to this disputed payment. FPR 1–15.205–8 "Contributions and donations" simply provides:

Contributions and donations are unallowable.

The board opinion offers an exhaustive history of this regulation, its relationship to the earlier developed Armed Services Procurement Regulations (ASPR), and of the history of the treatment of charitable contributions generally under the Internal Revenue Code. That history is not fully repeated here.

Suffice it to say that during World War II and for some time thereafter, charitable contributions were regularly

---

7. In a case where the direct "benefit" to the Government was less readily perceivable than it is in this nonprofit contract, the court reached the same conclusion in Lockheed Aircraft Corp. v. United States, 375 F.2d 786, 793–794, 796, 179 Ct.Cl. 545, 558, 562 (1967).

reimbursed under cost-type Government contracts. Criticism of this developed, principally from the Comptroller General who did not consider them "incident to and necessary for the performance of the contract.". His exceptions were, however, overruled if the contracts in question were governed by regulations permitting reimbursement of charitable contributions.[8] Charitable contributions were even allowed as indirect costs in the price-redetermination of fixed-price contracts.[9]

But in 1949 the Defense Department, in ASPR Section XV, expressly declared contributions and donations unallowable as costs under cost-reimbursement contracts. Although not particularly relevant (except as history), the board observes that this policy has been severely criticized. It cites a number of respected authorities on that point. A relaxation of that prohibition against reimbursement of charitable contributions, proposed by the ASPR committee in 1969, was aborted following a newspaper article headlined "Pentagon May Repay Firms Charity Gifts."

What this history demonstrates above all else is that the policy interdicting reimbursement of charitable contributions finally grew out of a reluctance to reimburse profit-earning contractors for costs not "incident to and necessary for the performance of the contract." These were the words of the Comptroller General, above-quoted.

■ The facts above-summarized hardly serve to put plaintiff, and this payment, in the category of a profit-earning contractor seeking reimbursement of a cost not "incident to and necessary for the performance of the contract." As plaintiff observes, regular payments made over a sustained period of time which enable a contractor to receive services which are an integral and necessary part of the overall operation of the contractor's business and are directly beneficial to the contract, are not "contributions and donations" within the generally accepted definition of that phrase. This payment is not a gratuity, motivated by generosity or public relations, the type of charitable contribution reviewed in the above-summarized history. It is far more like the "contribution" involved in General Dynamics/Astronautics, ASBCA No. 6899, 1962 BCA ¶ 3391, which the board properly found to be a payment necessary to get the job done. By way of analogy, the payment at issue in this case would not be regarded as a "gift" under tax precedents.[10]

The board seeks to distinguish its prior opinion in General Dynamics/As-

---

8. Cited in the board opinion are Cramp Shipbuilding Co. v. United States, 122 Ct. Cl. 72 (1952); Consolidated Vultee Aircraft Corp. v. United States, 97 F.Supp. 948 (D.C.Del.1951); Nash-Kelvinator Corp., NBCA No. 524, Feb. 28, 1949 (Navy Board of Contract Appeals, unreported); Consolidated Vultee Aircraft Corp., Army BCA No. 1594, 4 CCF ¶ 60,437 (1947); Hudson Motor Car Co. v. Navy Dept., OCS No. 134, 4 CCF ¶ 60,349 (1947); and Bell Aircraft Corp., War Dept. BCA Nos. 1158 & 1169, 4 CCF ¶ 60,053 (1945).

9. The board opinion cites Swartzbaugh Mfg. Co., ASBCA No. 792, Nov. 25, 1952; and Avco Mfg. Corp., ASBCA No. 1117, Feb. 10, 1954. BCA opinions were not published verbatim by Commerce Clearing House (CCH) prior to 1956.

10. See Commissioner v. Duberstein, 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L. Ed.2d 1218 (1960).

"* * * [I]f the payment proceeds primarily from 'the constraining force of any moral or legal duty,' or from 'the incentive of anticipated benefit' of an economic nature. Bogardus v. Commissioner, 302 U.S. 34, 41, 58 S.Ct. 61, 82 L.Ed. 32, * * * it is not a gift. * * * A gift in the statutory sense, on the other hand, proceeds from a 'detached and disinterested generosity,' Commissioner v. Lo Bue, 351 U.S. 243, 76 S.Ct. 800, 803, 100 L.Ed. 1142 * * * 'out of affection, respect, admiration, charity or like impulses.' Robertson v. United States, 343 U.S. 711, 72 S.Ct. 994, 96 L.Ed. 1237 * * *."

See also Singer Co. v. United States, 196 Ct.Cl. 90, 449 F.2d 413 (1971).

*tronautics, supra,* on the ground that the $50,000 contribution in that case was a bargained for *quid pro quo.* But the attempt at distinction is not persuasive. In that case a profit-earning contractor became aware of serious traffic problems which would develop for its employees seeking ingress and egress to a newly constructed plant. The problems could be alleviated by construction by the State of California of an overpass, at its intersection with a major freeway. Although the need for the overpass was recognized by state highway officials, one was not contemplated for a number of years.

It was common practice in California for an interested party who thought a certain highway merited preferred attention, "to offer some contribution toward its cost," which often resulted in its being given a higher priority. A suggested contribution of $50,000 was in fact made, and this was then confirmed in an agreement which in turn brought about earlier completion of the overpass, and a potential gain in employee efficiency at the contractor's plant.[11]

In that case, the argument also was made by Government counsel that reimbursement of this $50,000 contribution to the State of California was prohibited by the same regulation as to contributions and donations involved in this case. The board stated:

* * * We do think it clear however that in the context we have here, neither of the words in question [contributions and donations] has the effect of inhibiting an expenditure

which is made for and that results in a distinct and tangible benefit to both the Government and the contractor with respect to a project and a contract in which they are engaged. We find that the appellant's payment made for the purpose of facilitating and expediting the overpass construction was such an expenditure and that its effect was directly and definitely beneficial to the Atlas program, and was an exercise of sound business judgment, from the standpoints of efficiency in the conservation of employee working time and the factors set forth in ASPR 15–204(g). And this view is not altered by the circumstance that the accrued benefit is perhaps not susceptible of precise mathematical measurement.

The fact that the arrangement in *General Dynamics* was ultimately reduced to contract with the State, does not distinguish it from the case at hand. Here too we have a readily discernible *quid pro quo,* and in a real sense a consensual arrangement. If anything, the benefits to the defendant in this case are more "susceptible of precise mathematical measurement" than they were in *General Dynamics.*[12]

The board briefly raises an additional argument that if plaintiff makes a payment to the Federation and the Federation in turn receives a grant of appropriated funds from HEW, reimbursement of the Blue Cross payment to the Federation "would have the effect of causing the Government to make a grant of matching funds to match funds coming from the Federal Government itself in the guise of contract costs."[13]

11. The board states "[i]ncidentally the evidence establishes without controversion that this practice was quite prevalent in the State of California and of course with no implication of improper dealing among these concerned."

12. Drawing once again on tax precedents for analogy, attention is invited to Sarah Marquis, 49 T.C. 695 (1968), *acquiesced in,* 1971–2 Cum.Bull. 3. The taxpayer in that case was permitted to deduct contributions to church, educational and other charitable organizations, the clien-

tele of her travel agency business, as a business expense, even though there was no binding obligation or "contract" on the part of the recipients to continue doing business with the taxpayer. The Tax Court in that case concluded that it "would stretch credulity to characterize the payments at issue as 'contributions'."

13. It should be recalled that the board opinion had previously referred to this matching grant as "unrelated" to the payment at issue in this case.

In this respect, however, the board answers its own argument very effectively, as follows:

> However, this objection is equally applicable to certain other costs of contract performance that are made allowable by ASPR, Section XV. The following are examples of costs made allowable by ASPR, Section XV, which involve payments by contractors to organizations who receive financial support by grant from the Federal Government pursuant to Acts of Congress: Taxes paid to state and local governments; research and development costs; membership in and subscription to publications of technical and professional organizations; and programs of training and education procured from educational institutions.[14]

In summary, if this payment is disallowed, regular subscribers to Blue Cross are burdened with the allocable cost of plaintiff's payment to the Federation for benefits realized by the defendant under its contract with plaintiff for administration of the Medicare program, as well as being burdened with the costs allocated to regular subscribers. The payment here at issue very clearly serves a contract purpose, and both the history and precedents heretofore cited demonstrate that the prohibition against reimbursement of charitable contributions was not intended to reach to a payment such as this.[15]

Accordingly, plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied, and judgment is entered for plaintiff in the sum of one thousand five hundred and ninety-eight dollars ($1,598).[16]

---

14. *Also see* and *cf.* the board's prior opinion in Cornell Aeronautical Laboratory, Inc., ASBCA No. 8536, 1964 BCA ¶ 4204.

15. *Compare* American Chem. Soc'y v. United States, 438 F.2d 597, 194 Ct.Cl. 370 (1971), wherein the regulations prohibiting reimbursement of "interest" were distinguished, on the facts present in that case.

---

16. Defendant's counsel suggests (but offers no proof), that reimbursement of larger sums hinge on this decision. That is not uncommon, if true in this case. It would have no bearing on the result reached since, under the theory of this case, payments reimbursed are of the type intended to produce equal or greater cost savings to defendant incident to its contract.