Charles W. CARLSTROM
v.
UNITED STATES.
No. 542-57.

United States Court of Claims
Oct. 7, 1959.

David A. Block, San Diego, Cal., for plaintiff.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

PER CURIAM.

This case was referred by the court, pursuant to Rule 45(a), 28 U.S.C.A., to S. R. Gamer, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed May 28, 1959. When more than the specified time elapsed after the filing of this report and neither party gave notice in writing of an intention to except to it, defendant filed a motion for judgment based on the commissioner's report. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Plaintiff is therefore entitled to recover and judgment will be entered for plaintiff in the sum of $20,147.40, plus interest as part of just compensation at the rate of four percent per annum on each monthly installment of $387.45 as it became due until date of payment, said installments commencing on August 1, 1953, and ending November 1, 1957.

It is so ordered.

### Opinion of Commissioner

This case grows out of the occupancy by a branch post office of premises in a shopping center owned by plaintiff. When the post office first occupied the premises, the entire area, consisting of a residential community and a commercial shopping development in the center thereof, was owned by defendant. It had been constructed in 1942 and operated by the Federal Public Housing Authority (FPHA) as a housing project for warworkers. The development, called Linda Vista, is located within the city limits of San Diego, California, but approximately six miles north of the center of the city. It is part of a table of land called Kearny Mesa. Going north, the mesa is separated from the city by a canyon called Mission Valley. Another canyon, called Tecolote Canyon, also separates the mesa from the west. The mesa is, however, approachable from the city through the east without any natural barriers, and similarly connects with the area to the north without any appreciable drop in the land. However, as a result of the geographical characteristics of the mesa and its distance from the main portion of the city, the Linda Vista development, as well as other subsequent developments on the mesa, evolved somewhat like a separate city.

Pursuant to an interdepartmental arrangement between the Post Office Department and FPHA, no rent was paid by the Department for the use of the premises by the post office. However, in 1952, defendant offered the shopping center for sale and, pursuant to a bid made by plaintiff which was accepted, plaintiff took title to the center on August 1, 1953, subject to such leases as had theretofore been entered into by defendant with the various tenants. The Post Office Department had no such lease. Accordingly, it was, as of August 1, 1953, for the first time obliged to consider the problem of paying rent for the premises, and its representatives had several conferences with plaintiff with respect thereto.

The premises consisted of 2,583 square feet of space with 28 feet of frontage in a frame construction building 350 feet long and 116 feet deep. As of August 1, 1953, three tenants occupied the entire building, consisting of the post office in the center, a branch of the Bank of America adjoining on one side occupying 3,248 square feet of space, and the principal tenant, a department store, occupying 34,945 square feet of space on the other side. The building was the largest of the six buildings comprising the shopping center, and had a spacious improved parking area immediately adjoining.

Plaintiff felt that a monthly rental of $516.60, computed on a basis of 20 cents per square foot, was reasonable. How-

ever, the Post Office Department's representatives considered this to be excessive. They offered $219.56 a month, computed on a basis of $1 a square foot per year, or 8½ cents per square foot per month. With this wide discrepancy between them, agreement was never reached, despite further negotiations and discussions. In the meantime no rent in any amount was paid. Even prior to August 1, when plaintiff assumed ownership, the Department's representatives attempted to find other suitable space in the area at a price they considered to be reasonable, an endeavor that met with many obstacles. They continued in this effort throughout the period of their occupancy of plaintiff's premises, but it was not until November 30, 1957, that the Department finally vacated plaintiff's premises. It had thus occupied the premises for four years and four months, or a total of 52 months, without paying any rent.

The parties are in agreement that defendant's possession of plaintiff's property for 52 months resulted in a temporary taking of the use of the property and gives rise to a valid claim for just compensation under the Fifth Amendment. See Riverside Military Academy, Inc. v. United States, 122 Ct.Cl. 756, 784. The parties also agree that such compensation is to be measured by the reasonable rental value of the premises, plus interest as a part of just compensation. Barcroft Lake Shores, Inc. v. United States, 135 Ct.Cl. 623, 626. They further agree that the highest and best use of the premises was as a retail store or for a retail service use, which was similar to the use to which the other space in the shopping center was devoted. However, the parties disagree as to what a reasonable rental value was for such type of use for the period of occupancy.

The most nearly comparable locations in the shopping center, which consisted of six buildings, were naturally, the two other adjoining stores in the same building in which the post office was located. The lease of the branch of the Bank of America was entered into in 1947 at a rate of $350 per month, which came to 10.8 cents per square foot. Over the years its rent was twice increased. By the time the lease expired in June 1955, it was paying $450 per month or 13.9 cents per square foot and it had paid such rental for the past three years. There was a 12½ percent increase in its rent in 1950, when the rate was increased to $400 per month, and another 11.2 percent increase in 1952, which produced the $450 rate. After its lease terminated in 1955, it paid plaintiff $1,500 per month, or 46.2 cents per square foot, but this was only for a short period of time and until it was able to move to its new building nearby, then under construction. There is little question but that this was an excessive rental imposed on the bank by plaintiff when the bank was hardly in a position to resist, and no weight should therefore be afforded it.

Since the last rental paid under the lease in 1955 was agreed to in 1948, and without being able to foretell the dynamic growth of the San Diego area and the general postwar increase in land values therein, including the mesa generally and the Linda Vista area thereon, (finding 9) it appears that the 13.9 cents per square foot rate it was paying was and had been somewhat too low.

After the bank moved in March 1956, the premises remained vacant for almost six months. Thereafter, they became occupied by a furniture store under a lease whereby rent was paid on a basis of a percentage of gross sales, with a $250 per month minimum. The highest rate paid during the period herein involved was $611.42, or 18.8 cents per square foot for March 1957. The average for the four months in 1956 that it occupied the premises was 13.4 cents per square foot. The business was not a profitable one and the 1957 figures are somewhat distorted by the fact that in four of the 12 months, including three of the last four months, the $250 minimum was paid, and after two more such minimum rental months in 1958, the business vacated the premises. For most months in 1957 in

which the minimum was not paid, the rent was somewhere between 13 and 14 cents per square foot. Some consideration must be given to the fact that the particular business involved did not turn out to be a profitable one. In only three of the 18 months it occupied the former bank premises was rent paid on the basis of more than 14 cents per square foot. In September 1956, the first month of the lease, $488, or 15.1 cents per square foot was paid; in February 1957, $479.81, or 14.7 cents per square foot was paid; and in March 1957, $611.42 or 18.8 cents per square foot was paid. The 1956 average rent was 13.4 cents per square foot and, excluding the four months in 1957 in which the minimum was paid, the 1957 average was 14.2 cents per square foot (finding 11(b)).

The department store on the other side of the post office also had a percentage lease, but with no minimum. In 1953, it paid rent of $67,384, or 16.1 cents per square foot. This was after experiencing a steady rise in business since 1948 (finding 11(c)). However, its business gradually but progressively fell off each year thereafter, going down to $59,959 (14.3 cents per square foot) in 1954 and finally to $36,777, or 8.8 cents per square foot in 1957 (finding 11(c)).

The relatively poor business experienced by the furniture store in 1956 and 1957, as well as the progressive reduction in business experienced by the department store after 1953 reflects at least in good part the adverse effect on the Linda Vista area of the removal of 1,900 demountable, temporary, houses. This removal commenced in the latter part of 1953 and extended into the early part of 1955. It had a drastic effect on the population of the area. Prior to the removal program, the area's population was approximately 21,300. After the removal was completed, it was only approximately 13,300, the population thus being reduced by some 8,000. Business in the area naturally suffered. While the greater San Diego area was enjoying a spectacular growth and a general business prosperity, the local situation in the Linda Vista area, which, by reason of its geological set-up and distance from the center of the city, was practically a separate community, represented somewhat of a counter-trend. During the 1953–1957 period herein involved, new construction of homes in the Linda Vista area amounted only to 615, as against the 1,900 removed.

Yet, there were at least some alleviating forces at work during the period. Large developments, both residential and industrial, were taking place on the mesa north of Linda Vista. As early as 1952, approximately 1,000 new homes were being built in these areas. As time went on, some of the developments expanded up to the Linda Vista area. In traveling from these new developments to San Diego, the highway led through Linda Vista and directly past the building in which the post office was located. The Linda Vista shopping center was the largest in the entire mesa area, and the department store therein was the only one on the mesa. The general rise in property values throughout the entire San Diego area was also reflected in the Linda Vista area. The Government, after selling the commercial shopping center in 1953, also subsequently sold the residential properties, and there were such improvements made by the new private owners as widening of streets, and the installation of sewer mains and water lines. While adversely affected by the removal of the 1,900 temporary homes, the Linda Vista area was not exactly a stagnant one and there were cross-currents at work which a businessman would necessarily have considered in viewing the Linda Vista shopping center, especially for a period of time beyond the immediate future.

In this case plaintiff still seeks 20 cents per square foot per month, or $516.60 per month for the 52 months in question, totaling $26,863.20, being the same square foot rate he sought in 1953 when he bought the property and had his first conferences with the Post Office Department representatives. Two expert real estate appraisers also testified in plaintiff's behalf. One testified that 18

cents per square foot, or $464.94, per month, would be a reasonable rate, totaling $24,176.88. The other testified that a progressively rising rate of 20, 21, 22, and 23 cents per square foot for the 4⅓ year period would be proper, totaling $29,032.92.

It seems clear that all of these rates are too high. They do not adequately reflect the downward trend of business in the Linda Vista area after 1954, despite the excellent conditions elsewhere in the general San Diego area. Neither of the two most comparable premises, being the ones directly adjoining the post office, produced such rental income during this period. As shown, the best produced by the department store was 16.1 cents per square foot, and that was only for the year 1953. The bank premises produced 13.9 cents per square foot through June 1955, and while this may have been a somewhat low rental in 1953 and 1954, having been contracted for as long ago as 1948, by 1955 the relatively poor business conditions in the Linda Vista area became clearly manifest. The $1,500 per month rent paid by the bank for a short period after the expiration of its lease and before it moved to its new quarters is to be disregarded as wholly unrealistic. In 1956, after the bank moved, the space remained idle for six months. If plaintiff was also attempting to obtain 20 cents per square foot for this comparable space, it was obvious that he was not able to do so, despite the fact that the space, being on a corner, was somewhat more attractive than the post office space. And thereafter, the premises produced no such rentals under the furniture store's occupancy when a rate less than 14 cents per square foot was generally forthcoming under its percentage lease when the minimum was not paid, with four months in 1957 falling into the minimum category. If progressive rates on an annual basis were adopted in this case, it seems plain that it should be on a progressively descending, rather than ascending, basis.

Defendant's expert testified that, for the entire period in question, 12½ cents per square foot, or $322.87 per month, totaling $16,789.50 for the 52 months, would be reasonable. However, this rate would appear to be too low. It is true that the average rate produced by the department store for the entire five-year 1953–1957 period was approximately 12 cents. While the progressively decreasing gross sales after 1953 cannot be disregarded, nevertheless the last two years were under plaintiff's own ownership, and plaintiff had it within his power to increase the rentals. Even though the rental rate under plaintiff's ownership was, for book purposes, maintained on the same basis as it had been prior thereto, the significance of a rental rate paid by an owner to himself is weakened by the fact that it lacks the arm's length quality of a true market transaction. If the 1956 and 1957 rentals are disregarded, the average rental produced by the store was 13.6 cents per square foot (finding 11(c)). Furthermore, generally a better rate is given to a large 35,000 square foot operation as compared with that in a relatively small 2,600 square foot area. In addition, a lease arrangement ordinarily calls for a better rental rate than a month-to-month occupancy such as was indulged in by the post office. Even the none too successful furniture store that moved into the bank premises in September 1956 paid more than 12½ cents per square foot in 11 of the 18 months it occupied the premises (finding 11(b)).

Taking all the facts and circumstances into consideration, including the rentals produced by the two most comparable locations, the depressed near-term business conditions in the Linda Vista area commencing in 1954 as reflected by the decreased department store sales, the favorable longer-term factors in the area as a result of new local developments in the Linda Vista area itself as well as the dynamic area developments in the greater San Diego area, especially on Kearny Mesa, the nature of the tenancy, the size of the premises, and the favorable location of these particular premises in relation to the shopping cen-

ter itself as well as to the main traffic artery leading into San Diego from the north, it is concluded that a rate of 15 cents per square foot per month would be fair and reasonable for the period in question. This would produce a monthly rental of $387.45, or a total for the 52 months herein involved of $20,147.40.

■ As is ordinarily true of situations where the Government takes private property, plaintiff is also entitled to interest on the rent as part of just compensation, Riverside Military Academy, Inc. v. United States, supra, and, as stated, defendant concedes plaintiff's right to such interest. However, plaintiff contends that the 4 percent rate which has been customarily applied by the court in recent years in just compensation cases is no longer realistic in view of current economic conditions, of which he requests the court to take judicial notice, and instead suggests either 5 or 6 percent, while defendant urges the application of the 4 percent rate.

■ The court as recently as March 1959 applied the 4 percent rate in a taking case. Matson v. United States, Ct. Cl., 171 F.Supp. 283. As the court in Arkansas Valley Railway, Inc. v. United States, 1946, 68 F.Supp. 727, 107 Ct.Cl. 240 stated in rejecting a claimed 6 percent rate and in reaffirming the 4 percent rate, while "there is no statute or rule fixing any particular rate to be allowed" in just compensation cases, nevertheless a "uniform rate does in fact avoid discrimination among litigants." 68 F. Supp. at page 730, 107 Ct.Cl. at page 259. There are no special circumstances here present which would warrant the application of a rate different from the customary one of 4 percent.

■ The parties are also in dispute as to the proper method of calculating the interest. Plaintiff contends that the interest should accrue on each monthly installment as it became due, commenc-ing August 1, 1953. Defendant contends that the entire principal amount should be calculated as of November 30, 1957, when defendant vacated the premises, and the interest then applied to such total amount commencing on such date. It seems clear that plaintiff's contention is correct. There was no lease. The parties considered the tenancy as being on a month-to-month basis. In such a tenancy, the rent would become due on the first of each month. Plaintiff is therefore "entitled to interest on the items of rents as they accrued." Riverside Military Academy, Inc. v. United States, supra, 122 Ct.Cl. at page 784. To the same effect, is Britton v. Western Iowa Co., 8 Cir., 9 F.2d 488, 491, 45 A.L.R. 711, where the court allowed interest "from the dates when the respective monthly rental payments * * * became due." The rule urged by defendant would be applicable only to a lump sum indebtedness and not to a series of payments accruing monthly. If defendant's contention is applied to a situation such as here involved, the accumulation of interest could be defeated simply by remaining in the property longer, although the very purpose of awarding interest as part of just compensation is to compensate for the delay in payment of the compensation after the property is taken. Seaboard Airline Ry. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664.

For all of the above reasons, it is recommended that judgment be entered for plaintiff in the sum of $20,147.40, being the total of 52 months rent at $387.45 per month, resulting from the application of a rate of 15 cents per square foot per month, plus interest as part of just compensation computed at the rate of 4 percent per annum on each monthly installment of $387.45 as it became due until date of payment, the installments commencing on August 1, 1953, and ending on November 1, 1957.