

### III

Finally, plaintiff seeks interest on the premium charge of $22,622 from the date of payment to the date of the agency's final decision on the ground that there was a taking of its property, since plaintiff was not afforded notice and opportunity to present its case before making payment. It has already been decided that the FHA Commissioner has no duty to accord plaintiff an evidentiary hearing before requiring payment of the premium charge. *Camellia Apts., Inc., supra,* 334 F.2d at 671–672, 167 Ct.Cl. at 230–231; Grymes Hill Manor Estates v. United States, 373 F.2d 920, 923, 179 Ct.Cl. 466, 472 (1967).

For the reasons stated, plaintiff is not entitled to recover on either of its alternative claims. Defendant's motion for summary judgment is granted; plaintiff's motion for summary judgment is denied, and the petition is dismissed.

**DRAKES BAY LAND COMPANY**

v.

**The UNITED STATES.**

**No. 275–66.**

United States Court of Claims.

May 12, 1972.

Benjamin P. Bonelli, San Rafael, Cal., attorney of record, for plaintiff. Jess S. Jackson, Jr., Burlingame, Cal., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, DUR-FEE, Senior Judge and DAVIS, SKELTON, NICHOLS and KUNZIG, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson pursuant to the decision rendered on April 17, 1970, entering judgment for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) (2). On October 15, 1971, the commissioner filed his opinion, findings of fact and recommended conclusion of law in compliance with the court's decision. Both parties filed exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law and the case has been submitted to the court on the briefs of the parties and oral argument of counsel.

The court does not accept plaintiff's claim that it is entitled to recover in this action the sum of $56,000 which it says it expended in attempting unsuccessfully to negotiate with the government exchanges of land for the area involved here. Nor can plaintiff recover the $190,000 for the profits alleged to have been lost through the government's prevention of the subdividing of the land. Neither of these is an element of the just compensation which is to be awarded in this case.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its judgment in this case. It is therefore concluded that plaintiff is entitled to judgment against defendant for just compensation for the taking by defendant of plaintiff's land on July 23, 1963, in the sum of $631,800, with interest as a part of just compensation at the rate of 4 percent per annum from July 23, 1963, until paid, provided that plaintiff may obtain payment of such award only upon tender of a deed to such property in such form as the Attorney General may deem necessary to assure the defendant a valid fee simple title. It is further concluded that plaintiff is entitled to recover the reasonable attorney, appraisal and engineering fees actually incurred by plaintiff because of the proceedings in this case, with the amount of recovery in this respect to be determined, and with judgment to be entered for plaintiff in this case, in further proceedings pursuant to Rule 131(c).

OPINION OF COMMISSIONER

HOGENSON, Commissioner:

By its opinion announced April 17, 1970, 424 F.2d 574, 191 Ct.Cl. 389, this court decided that plaintiff was entitled to just compensation for the taking by defendant of the entire fee in plaintiff's 468-acre tract of land located within the boundaries of the 53,000-acre Point Reyes National Seashore (Seashore) authorized by Public Law 87–657, approved September 13, 1962, 16 U.S.C. § 459c–1 (1964), 76 Stat. 538.

Because there was a taking of the entire fee, the court rejected plaintiff's theory that defendant had taken a scenic easement, or part interest in the land. In the first trial, testimony and evidence on damages related to the theory of partial taking. Plaintiff then claimed entitlement to the amount of diminution in value of the land, allegedly caused by activities of defendant in the creation and establishment of the Seashore. Such diminution was allegedly the difference between the value of the land at its highest and best use as a subdivision for sale of small lots and the value of such land for agricultural use. Having rejected the theory of partial taking, the court omitted findings of fact concerning diminution of value, holding such were irrelevant, and remanded this case for determination of just compensation on the basis of the value of the entire fee.

At the trial of this case on remand, the parties stipulated at the outset that the date of taking of plaintiff's land by

defendant was July 23, 1963, which stipulation was accepted by the trial commissioner, and it was so found. Even though corresponding with the date of acquisition by defendant of the Heims ranch, such date is accepted only as a reasonable time for assessment of value in the determination of just compensation, not as pinpointing a coincidental event as the act of taking in derogation of the court's opinion.

It is noted that the court stated that a better date than any other is that of the refusal by defendant to purchase plaintiff's land that followed its success in thwarting plaintiff's subdivision of its land by acquiring the Heims ranch which lay across the only feasible access. 424 F.2d at 587, 191 Ct.Cl. at 414. The only facts of record concerning defendant's earliest refusal to purchase following acquisition of the Heims ranch are set forth in the court's finding of fact No. 88, stating that in the fall of 1963, the Service advised plaintiff that it did not intend to purchase plaintiff's land at that time and did not know when it would do so. 424 F.2d 574, 191 Ct.Cl. at 443.

However, July 23, 1963, was the date when defendant purchased the 1,135-acre Heims ranch for $850,000. No subdivision activities were planned or contemplated on such property. This was the first acquisition by defendant of private land within the Seashore in implementation of the Seashore establishment. In recognition that there can be no condemnation of Federal land, defendant's early purchase of the Heims ranch was for the primary purpose of preventing condemnation of a right-of-way over such ranch, thereby frustrating permanently plaintiff's efforts to accomplish a duly approved subdivision of its land for sale in small lots or parcels.

The proposed access road for plaintiff's planned subdivision extended from plaintiff's land across intervening lands and through the Heims ranch to the Sir Francis Drake Highway. A local assessment district had been organized on July 31, 1962, by local county officials, as authorized by law, on the petition of plaintiff and other landowners in the area. It was organized for the purpose of accomplishment of condemnation of the necessary right-of-way (following the course of an existing road too narrow in width) and for the construction thereon of a road meeting county road standards, as required by county ordinances for access to a subdivision such as proposed by plaintiff. The county officials had previously decided that such an access road would have to be constructed before official approval of plaintiff's subdivision plans would be allowed. Defendant's purchase of the Heims ranch permanently foreclosed the possibility of construction of the access road.

Actually plaintiff's efforts toward subdivision of its land were frustrated to the point of cessation in early November 1962, within 2 months after enactment of the Seashore legislation, when the regional planning officer of the National Park Service (the Service) advised the attorney for the assessment district (appointed by the county officials when they created such district) and plaintiff's principal officer that the Service had in its possession a quitclaim deed from the owners of the Heims ranch to the United States, covering a 50-foot strip of the Heims ranch along its entire border with Sir Francis Drake Highway. Such deed was exhibited to plaintiff's representative. It had been executed and delivered by the owners of the Heims ranch to the Service, with the expressed intent that it be used to prevent condemnation of the right-of-way for the proposed access road. The representative of the Park Service threatened to record the deed, if activities continued with respect to the construction of the access road. Plaintiff and the assessment district understood that if such deed were accepted and recorded by defendant, successful condemnation proceedings would have been legally impossible. About mid-November 1962, plaintiff's representative and the attorney for the assessment district conferred and decided that it would be a waste of

money to continue the access road project, and such activities were terminated.

Prior to mid-November 1962, and after its creation on July 31, 1962, the assessment district by its engineering firm, also appointed by the county officials, had surveyed the pertinent portion of the right-of-way, and by its attorney, the district had prepared a resolution to be submitted to the county officials preparatory to filing eminent domain proceedings on the section of the proposed road through the Heims ranch.

With respect to plaintiff's activities for subdivision of its land, it is to be noted that the two organizers of plaintiff corporation were experienced land subdividers. In December 1959, they obtained an option to purchase at $350 per acre a 1,000-acre tract (optioned tract), which included the subject 468 acres. Between the optioned tract and the shore of Drakes Bay lay another 1,000-acre tract (Drakes Beach Ranch) owned by Drakes Beach Estates, Inc., which company had commenced subdivision activities thereon. Such company had pending a law suit with an adjoining property owner concerning access to its tract. Such suit was settled in such a manner that additional access was afforded to the optioned tract which included subject land as a part. The seller then realized the potential of the optioned tract for subdivision, and he attempted to withdraw from the option agreement. In the meantime, plaintiff corporation was organized on February 24, 1960, and a suit for specific performance of the option agreement was commenced, which resulted in acquisition of the optioned tract by plaintiff on March 30, 1960, in accordance with the option agreement.

Plaintiff acquired such land for the purpose of subdividing and selling it in small lots and parcels. In late 1960 or early 1961, the two organizers, Benjamin P. Bonelli and David S. Adams, agreed to a division of the 1,000-acre tract into two tracts, and Adams took title to one tract and relinquished his interest in plaintiff corporation. The

tract retained by plaintiff included the 468 acres comprising subject land.

In the spring of 1961, three new shareholders acquired stock in plaintiff corporation, each holding a one-quarter interest, as did Bonelli. Each was a specialist in assessment district financing of subdivision projects, two being heads of the improvement bond departments of different investment companies, and the third being an attorney in a law firm specializing in such matters. Bonelli brought these new stockholders into plaintiff corporation to assist in making arrangements for the financing of subdivisions on plaintiff's land.

It was not until 1961 that legislation was proposed in Congress that the Seashore comprise the 53,000 acres eventually established as such on September 13, 1962, in the enactment of a bill introduced in 1962. Prior legislative proposals in 1959 and 1960 included only 35,000 acres, with plaintiff's land outside such area. It was not until January 17, 1962, that the Board of Supervisors of Marin County, within which the Seashore is located, voted in favor of enlargement of the Seashore to the 53,000 acres, having previously voted against enlargement beyond an area of 20,000 acres, which did not include plaintiff's land. Congressman Miller of the congressional district including the Seashore had previously informed the Board that the Seashore bill could not be enacted unless the Board adopted a resolution in favor of the 53,000-acre area. The change in position of the Board followed a recall election in which a Board member opposing enlargement of the Seashore was removed from office, being succeeded by an advocate thereof.

On February 3, 1961, almost a year prior to the favorable action of the Marin County officials on the enlargement of the Seashore to the 53,000-acre area, and more than 1½ years before enactment of the Seashore legislation on September 13, 1962, plaintiff filed a subdivision map on subject land entitled "Drakes Bay Pines" and a verified petition with the Marin County Planning

Commission, requesting variances from road improvements standards commensurate with the improvements required by Marin County in other subdivisions in the nearby area and in western Marin County up until that time.

Engineering and legal work on subdivision maps had been commenced by plaintiff in 1960 and continued through 1961 and 1962.

In late 1961 and early 1962, Bonelli on behalf of plaintiff conferred with the regional planning officer of the Service, who advised among other matters, that plaintiff's land would be within the boundaries of the final Seashore bill, and that the Service urgently desired to exchange other Federal land for plaintiff's land pursuant to Section 8 of the Taylor Grazing Act, indicating that subdivision of plaintiff's land would scar the hills and partially destroy the scenic value of the area, and would increase land values and make acquisition of the Seashore more difficult for the Service.

In reliance on the good faith of defendant in proposing such a land exchange, plaintiff then withdrew its tentative subdivision map from the Marin County Planning Commission, and Bonelli spent considerable time and effort viewing Federal land available for exchange in California, Nevada, and Arizona.

On March 13, 1962, plaintiff filed a subdivision map and verified petition with Marin County, proposing to subdivide 168 acres of its land into 76 lots, and requesting variances as to road standards only on the access roads, not as to roads within the proposed subdivision. Plaintiff filed such subdivision map because no Seashore legislation had been enacted, and because it was experiencing financial difficulties in meeting accrued tax and mortgage liabilities. Approximately 2 years are required for a subdivider to be ready to sell lots after the initial engineering work has been done. Plaintiff was concerned that it would not be in a position to sell lots if the Seashore bill was not enacted in 1962.

In 1962, concurrently with the filing of the second Drakes Bay Pines subdivision map, plaintiff began the construction of dirt roads within the proposed subdivision.

On April 2, 1962, a public hearing was held on the pending Drakes Bay Pines subdivision proposal by the Marin County Planning Commission, and the regional planning officer appeared and read the protest of the Service, quoted in the court's finding of fact No. 22.

On April 30, 1962, a hearing was held before the Marin County Board of Supervisors, at which time Marin County Counsel advised that the Board could require construction of a county-standard access road from the edge of a proposed subdivision to an existing county-standard road as a condition of approval of a subdivision map. Sir Francis Drake Highway was the one county-standard road in existence in the area. There were two routes available for an access road from plaintiff's proposed subdivision to such highway. One was down the steep easterly slope of Inverness Ridge. The Board reasonably determined that such route was not feasible for construction of a county-standard access road, and on that basis, denied approval of plaintiff's proposed subdivision on May 29, 1962.

However, after consulting with the Marin County Engineer, the Board then advised plaintiff that the other available route, i. e., along the existing road through the Heims ranch, was the only one over which a county-standard access road could be constructed, to permit plaintiff to subdivide its land. Of course, such route was the one which the assessment district, subsequently created by the Board on July 31, 1962, employed in its unsuccessful efforts to condemn a right-of-way and construct the access road, as described above.

In early 1962, plaintiff took steps to obtain water service from the Inverness Water Company, a public utility, which owned and operated the water system at the town of Inverness, approximately ½ mile from plaintiff's land. Such compa-

ny was willing to incorporate plaintiff's land within its service area. On March 8, 1962, such company filed its application with the California Utilities Commission, requesting issuance of a certificate of convenience and necessity permitting it to provide water service to plaintiff's land. On May 1, 1962, a public hearing was held on such application before the Utilities Commission, at which the National Park Service appeared as a protestant, and at which the regional planning officer with the approval of the National Director testified in opposition to the application, as related in the court's finding of fact No. 72.

On September 4, 1962, the Utilities Commission denied the application. After enactment of the Seashore bill on September 13, 1962, the water company was unwilling to consider providing water service to plaintiff's land.

The foregoing facts concerning plaintiff's subdivision activities have been recited in detail because they bear heavily upon the question of the validity of the appraisal theories of valuation experts whose testimony was presented at the trial on remand. In determining just compensation, however, consideration has been given to all of the court's findings of fact, 424 F.2d 574, 191 Ct.Cl. at 415–444, as well as the supplementary facts found on the testimony and evidence adduced at the remand trial.

As of the date of taking, no physical improvements existed on subject land except a small reservoir, boundary fencing, and a network of narrow and rough-graded dirt roads, described in finding of fact No. 93.

Adequate sources of water exist and have existed on plaintiff's land to furnish water sufficient for a subdivision of such land into 2-acre lots, or into parcels of 20 acres or more, for recreational homesites.

As of July 23, 1963, and for about 3 years prior thereto, the highest and best use of plaintiff's land was for subdivision into small lots (each about 2 acres in size) for sale for recreational homesites.

Whether subdivided into lots about 2 acres in size, or into parcels of 20 acres or more, subdivision of subject land would have provided lots or parcels, each of which would have been in or in close proximity to a wooded area. Most of the lots or parcels would have had a view of Drakes Bay and the Pacific Ocean, with those on the skyline of Inverness Ridge having additionally a view of Tomales Bay to the east. Some of the 2-acre lots would have had no view of the ocean or bays, particularly those on the side slopes of the hogback ridge, extending down to the valley boundary lines of subject land. Those in the lower part of the land were open grassland, but had the amenity of proximity to the reservoir.

The appraisal witnesses in the trial of this case on remand were Floyd D. Clevenger and Desmond Johnson, called by plaintiff, and William H. Murray and Albert L. Johnson, called by defendant. Each of them had substantial qualifications and experience as a real estate appraiser. Their ultimate opinions as to the market value of plaintiff's 468-acre tract of land as of July 23, 1963, were from the highest to the lowest as follows:

| | |
|---|---|
| Desmond Johnson | $890,000 |
| Floyd D. Clevenger | $875,000 |
| Albert L. Johnson | $280,500 |
| William H. Murray | $280,000 |

In accordance with the admonition of the court in its prior opinion, i. e., that the determination of just compensation in this case should disregard both enhancement and diminution in value resulting from the Seashore project itself, 424 F.2d at 584, 191 Ct.Cl. at 408, each of such appraisers undertook to investigate as to whether or not any such enhancement or diminution in value occurred. All agreed, and it is so found, that there was no discernible enhancement of land values within or without the Seashore area as a result of the project. All recognized that in general sales of land within the Seashore area were frustrated by the Seashore project, except for the Ottinger sales mentioned

in findings 81 and 107 and included in other findings concerning sales data relied upon by the appraisers.

It is undisputed that promotion of the Seashore project by defendant, with attendant publicity, virtually eliminated the market for lot sales within the project area months before enactment of the Seashore legislation on September 13, 1962.

However, it is concluded from all of the evidence (summarized in the detailed findings of fact herein) that a high level of public interest had existed in sales of small subdivision lots for recreational homesites on Point Reyes Peninsula, both within and without the Seashore boundaries, prior to the development of the Seashore project, which market was destroyed as to land within the Seashore area by promotion of the Seashore.

The wide difference between the market values determined by plaintiff's appraisers and those decided by defendant's appraisers was basically and primarily due to their opposing appraisal theories. Plaintiff's appraisers treated subject land as undeveloped (except for the network of rough dirt roads) to be sold as an entire tract, but in such a state of subdivision planning that official approval of the subdivision was assured. They considered that but for the promotion of the Seashore project, subdivision would have been accomplished and such land would have been ready for sale in 2-acre lots by the date of taking. Defendant's appraisers considered subject land as investment property, basically agricultural in nature, to be held for realization of gain from the land value increases to be expected, with only a potential for subdivision use for homesites. These opposing theories cannot reasonably be reconciled, and it is necessary in fixing the amount of just compensation to decide first which theory is valid under the circumstances of this case. Secondly, consideration must be given to what adjustments, if any, should be made to the values determined by the appraisers who used the valid approach in determination of fair market value.

As shown by the findings of fact herein, plaintiff's appraisal witnesses used primarily and basically the residual land (or economic analysis) approach in reaching their opinions as to the market value of subject land as a whole. Both of them applied such method in the alternative to a subdivision of subject land into 229 lots of about 2 acres each and to a parcelization of subject land into tracts of 20 acres or more. Each preferred the 229 lot subdivision analysis. Each endeavored to confirm his opinion by use of the comparable sales approach.

As to the 229 lot subdivision analysis, each determined what the gross income would have been from the individual sales of all 229 lots into which subject land would have been subdivided. Such a subdivision map had been prepared by an engineering firm for plaintiff. To arrive at such gross income, each estimated the average sales price at which such lots would have been sold, relying on contemporary sales of lots and small parcels of land, located either in Paradise Ranch Estates, the subdivision adjacent to subject land on the easterly slope of Inverness Ridge, or in the Ottinger sales area on the Inverness Ridge, northerly of subject land.

From the estimated total receipts from sale of the 229 lots, each appraiser deducted the total costs which would have been incurred to accomplish subdivision of subject land, such as for construction of road improvements, a water system, drainage facilities, and for contingencies relating thereto. The estimate of such costs was supplied by an engineering firm. Also deducted from the total receipts were the subdivider's profit and overhead, interest expense during the period of development and sales, taxes, and promotion and sales expense.

The indicated market value (or residual value) of subject land was thus determined to be the difference between

the gross receipts from sale of the 229 lots and the deductions mentioned above.

But for the enactment of the Seashore legislation on September 13, 1962, the activities of the assessment district (created July 31, 1962) would have resulted in condemnation of the necessary right-of-way and construction of the required access road so that plaintiff would have obtained approval of its subdivision and been prepared to commence sales of lots on its land by the date of taking, July 23, 1963. In accordance with the mandate of the court relating to assessment of just compensation for the taking of plaintiff's land by defendant, *i. e.*, that any detraction from the value of plaintiff's land by the creation and establishment of the Seashore project and by the interruption of access by defendant's purchase of the Heims ranch should be disregarded, 424 F.2d at 588, 191 Ct.Cl. at 414, the appraisal theory of plaintiff's valuation experts must be basically accepted, subject to whatever adjustments are reasonably required on the basis of the weight to be given to the various factors on which their opinions are based. The appraisal theories of defendant's appraisers are rejected as contrary to the court's instructions concerning detraction from value by the creation and establishment of the Seashore.

■ Defendant's position is rejected that the residual land approach used by plaintiff's appraisers is invalid as a matter of law. Adequate authority exists for use of such approach in determining the market value of a tract of land, the highest and best use of which was for subdivision and sale in lots. See Highland Park, Inc. v. United States, 161 F.Supp. 597, 600, 142 Ct.Cl. 269, 274 (1958); United States v. Iriarte, 166 F.2d 800, 804 (1st Cir. 1948), cert. denied, 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371; United States v. Waterhouse, 132 F.2d 699, 702 (9th Cir. 1943), aff'd by equally divided Court, 321 U.S. 743, 64 S.Ct. 484, 88 L.Ed. 1047 (1944). Moreover, defendant's appraisers conceded that the residual land approach would be a proper method of appraisal, recognized and used in the appraisal profession, in the case of determination of the market value of a tract of land concerning which subdivision and readiness for sale of lots were accomplished facts. They considered such method inapplicable to subject land, and confined their appraisal theory to sale of a single tract of land, using comparable sales of basically agricultural lands having only a potential for subdivision, without any substantial activities having occurred with respect to subdivision.

However, upon a review of the entire record in this case, giving consideration to all relevant and material evidence relating to market value, it is my ultimate conclusion that the fair market value of subject land was less than that decided by plaintiff's appraisers. Their overall residual land approach is accepted as reasonably based upon sound considerations, except that it is my opinion that they were overly optimistic as to the average sales price at which the planned 229 lots of plaintiff's subdivision could have been sold; that sufficient consideration was not given to the circumstance that there would have been a bulk sale of plaintiff's land, i. e., a sale of the entire tract to a purchaser who would undertake the accomplishment of the sale of the lots, one by one; and that a willing seller and a willing purchaser would have adjusted the subdivision value of such land downward to reflect the wholesale nature of the transaction, at the same time taking into consideration resulting adjustments of the other factors used in the residual land approach.

■ After considering all of these matters together with the overall evidence in this case, it is my opinion that the fair market value of plaintiff's land as of July 23, 1963, was $631,800.

■ Plaintiff claims as a part of just compensation entitlement to interest on the market value of its land at the rate of 6 percent per annum from the date of

taking. The only evidence of record concerning this issue is the stipulated fact that defendant has paid 6 percent interest on judgments entered in the Federal District Court in condemnation actions brought by defendant involving lands located within the Point Reyes National Seashore. Of course, this was interest on judgments, not interest as a part of just compensation. Plaintiff adduced no proof in either of the trials in this case in the way of statistical data, testimony, or other relevant or material evidence concerning the question as to whether this court in an inverse condemnation case should award as a part of just compensation interest at a rate greater than the 4 percent rate which has been allowed by this court on any such taking since January 1, 1934. On the basis of recent authority, which is considered controlling, it is my conclusion that plaintiff is entitled to interest as a part of just compensation only at a rate of 4 percent per annum on the market value of its land from the date of taking, July 23, 1963, until paid. Confederated Salish & Kootenai Tribes v. United States, 437 F.2d 458, 460, 193 Ct.Cl. 801, 805 (1971).

█ Plaintiff claims entitlement to recovery of its reasonable costs in the way of attorney, appraisal and engineering fees incurred in the prosecution of this case. Public Law 91–646, the Uniform Relocation Assistance and Land Acquisition Policies Act of 1970, approved January 2, 1971, 84 Stat. 1894, provides in section 304(c) as follows:

(c) The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a) (2) or 1491 of title 28, United States Code, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

Since such legislation had been so recently enacted, plaintiff by the time of the trial on remand in February 1971 had had no reasonable opportunity to amend its pleadings and present testimony and evidence concerning the amounts and reasonableness of its expenses in the way of attorney, appraisal and engineering fees.

It was stipulated at the remand trial that plaintiff actually incurred attorney and appraisal fees. Plaintiff proved that it had actually incurred engineering fees in the prosecution of this case.

The parties then stipulated that the trial of such claim for fees be limited to the issues of law relating to the right of plaintiff to recover on such claim, reserving the determination of the amount of recovery, if any, on such claim for further proceedings. Defendant advised that it desired to research the question as to whether or not it was the intent of Congress that the above-quoted provision would apply to a proceeding in the current status of subject case, i. e., having been commenced prior to the enactment of such law, with judgment not having been entered as to the amount of just compensation recoverable.

In its brief to the trial commissioner, defendant concedes that plaintiff is entitled to recover in this case reasonable attorney, appraisal, and engineering fees actually incurred because of the proceedings in this case.

It is so held, with the amount of recovery in this respect to be determined in further proceedings, if the parties are unable to stipulate the amounts of the items involved.