that plaintiff continued to seek much more than the defendant offered, and it cannot be said to have abandoned its claim at any time. It took prompt action to bring the matter to a head,[4] and, though it was wrong in believing that it could pursue its breach claim after the unilateral determination, its legal position was not altogether frivolous. On the other hand, the case is remanded without prejudice to the power of the remandee agency to refuse to reconsider it, if it finds as a fact that defendant has been substantially prejudiced by the failure of the plaintiff to exhaust its administrative remedies in the first instance, or that the plaintiff has been inexcusably negligent in properly prosecuting its claim. This is not a case in which it is now clear that leniency should be exercised.

To avoid difficulties over the correct recipient of our remand under Pub.L. No. 92–415, we remand to the Secretary of the Air Force and let him decide, through whatever agency or person he designates, whether an appeal to the ASBCA should be permitted. The agency or person selected to decide this issue should give plaintiff a full and fair opportunity to present its case for the allowance of a delayed appeal.

On these grounds, action on the defendant's motion is suspended for thirty (30) days to allow plaintiff to amend its petition to state, if it wishes, a claim "under the contract." If such an amendment is duly filed, that new claim will be remanded under Pub.L. No. 92–415, this opinion, and Rules 149–150, to the Secretary of the Air Force to determine whether or not, in his discretion, to allow a delayed appeal to the ASBCA. At the same time the claim now stated in plaintiff's petition will be dismissed on

defendant's motion which will be granted to that extent.[5] If an amendment to the petition is not duly filed, the petition will be dismissed on defendant's motion.[6]

**James Leo KING et al.**

v.

**The UNITED STATES** *

**No. 138–67.**

United States Court of Claims.

Oct. 23, 1974.

---

4. The unilateral determination was issued on January 4, 1973, and the petition in this court was filed on May 25, 1973.

5. Since we have considered documents filed by defendant in support of its motion to dismiss, we treat the motion as one for summary judgment for failure to exhaust the administrative remedy. *See* Rule 38(b).

6. *See* footnote 5, *supra*.

*Since the decision of the court on June 12, 1970, the plaintiffs George K. Winter and Tom Fouts have died and their widows, Rachael Winter and Jennie Fouts, remain as surviving joint tenants. Motions to delete the decedents' names as plaintiffs were allowed on March 13, 1973.

James N. Jacobi, Washington, D. C., attorney of record, for plaintiffs; Kurrus & Jacobi, Washington, D. C., Robert H. Nelson, Darrell D. Kellogg, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., of counsel.

Nicholas S. Nadzo, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, and BENNETT, Judge.

## OPINION

**PER CURIAM:**

This case comes before the court on defendant's motion, filed August 12, 1974, for judgment, requesting that the court adopt the recommended decision of

trial Judge C. Murray Bernhardt, filed June 14, 1974, as amended, *ex parte*, on June 26, 1974, as the basis for its judgment in this case, plaintiffs having failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants defendant's motion and affirms and adopts the said decision as the basis for its judgment in this case. Therefore, plaintiffs are entitled to recover and judgment is entered for them to the extent set forth in the trial judge's conclusion of law following his opinion and findings of fact.

## OPINION OF TRIAL JUDGE

BERNHARDT, Trial Judge:

Since the decision of the court on June 12, 1970 (427 F.2d 767, 192 Ct.Cl. 548) holding for fee-owning and tenant plaintiffs on the issue of liability and remanding for damage determination a trial has been held, primarily to adjudge the fair market value of flowage easements over those portions of plaintiffs' upriver farmlands exposed to the likelihood of frequent flooding due solely to the backwater effects of the Toronto Dam and its impounded pool in Greenwood County, Kansas, and for secondary purposes of adjudicating claims for damages to crops. At the damage trial the defendant advanced new hydrology studies and, for the first time, contour elevation maps based on a photogrammetric survey conducted between trials under Government contract. The results of the survey bottom the Government's present contention that flowage easements are applicable to only a scant 35.-57 [1] acres out of a total of 1,037.24 acres, with the trifling aggregate of $92.74 in easement value, although defendant concedes a nominal value of $200 to each fee-owning plaintiff.

Bearing in mind the court's earlier conclusion that " * * * those parts of the plaintiffs' properties lower than 931 feet to 939.5 feet in elevation would be affected in certain parts by flood waters passing them in the river at a water surface elevation of between 931 and 939.5 feet * * * " (finding 8 in first opinion), the preparation and submission by the defendant of extensive hydrology data designed to persuade a contrary belief seems somewhat superfluous at this time and only peripheral to the present inquiry. Retrial of the liability issue is not in order. Finding 7(b) in the prior decision observes that the isolation of backwater effects involves a value judgment as to which experts might differ, which may account for the Government's current tack, as well as for the contrast with pre-dam predictions by its then hydrologists that backwater effects would justify the acquisition of partial flowage easements bordering all or most of the river's route threading through the plaintiffs' properties. Failure to follow the latter advice led to the present dispute. To adopt the Government's latest position would offer no greater assurance of accuracy (or mayhap error) than the view announced in the liability opinion to which the court is already committed, a view which is more akin to the Government hydrologists' very first prognostication as to backwater consequences than that to which the defendant now subscribes.

For these reasons we omit findings rehashing these liability aspects and adhere to those already made on the subject, rightly or wrongly, despite the submission of requests for findings drawn from testimony and exhibits as to liability in the damage trial record. The essential remaining problems are quantity and value.

As to quantity the plaintiffs claim 841.44 acres,[2] the Government concedes 35.57, plus another 14.90 tenanted acres. The Government's figure is somewhat

[1]. As to fee-owning plaintiffs. Another 14.90 acres conceded by the defendant to be subject to flowage easements relate to the claim of a tenant plaintiff.

[2]. Plaintiffs' arithmetic is conflicting. See fn. 1 to finding 3, *infra*.

low because it is based on new hydrologic data at odds with the court's announced finding as described above, and the plaintiffs' is unrealistically high because it purports to embrace all of their land lying below elevations of 945 feet in the lower tracts and 950 feet in the upper. In the condemnation proceeding prior to building of the dam, the Government bought fees and flowage easements to properties flanking the river between river mile 271.5 (the dam site) and upriver to mile 292.7, the fees being acquired generally for properties below an elevation of 927 feet, and flowage easements for properties between 927 feet and 936 feet, plus some easements up to 939.5 feet. Despite the fact that substantial areas of plaintiffs' farms stretching between river miles 293.5 [3] and 298.1 are shown on the contour elevation maps to be lower than 939.5 feet in elevation, and the further fact that the river bed falls approximately 15 feet in traversing the properties in suit (which would infer a generally corresponding change in elevation in the adjacent lands), the decision was made in the condemnation program to cut off all acquisitions above river mile 292.7, even in the face of hydrological advice that slight backwater effects of the dam extended a bit beyond the upstream limit of the subject properties.

Given the 15-foot decline in the river bed as the stream bisects plaintiffs' farms en route to the Toronto Dam, and the known elevations at which fees and flowage easements were acquired through condemnation in the downstream approaches to the dam as described above, there might appear to be some rough justice in raising the fee and flowage easement taking elevations in plaintiffs' farms to graduating levels from 0 to 15 feet higher than those employed in condemnation of the downstream reaches, depending on the decline in streambed elevation and surrounding land as the river progresses downstream past the plaintiffs' farms, provided of course that the backwater effect persists

as disclosed by the hydrologists' envelope curve. However, finding 8 in the previous decision, which has been quoted above in part, would serve to restrict the easement taking areas to those below an elevation of 939.5 feet. Finding 8, *infra*, measures this area to be 72.09 acres, of which 67.42 acres lie below the cropline and 4.67 acres above the cropline. Those acres below the cropline are presumably areas restricted to timbered river banks and sloughs not used for cultivation of crops, while those above the cropline are regularly planted to crops. But in the ultimate valuations arrived at we have given plaintiffs the benefit of the doubt and have considered the easement acreage to be crop land and valued accordingly.

Findings 5 and 6, respectively, describe in detail the appraisal evidence rendered by appraisers for plaintiffs and defendant, and the strengths and weaknesses of their methods will be omitted in this opinion. Whereas plaintiffs' appraisers advised that the flowage easement value of plaintiffs' 841.44 affected acres was $147,850, while defendant's appraiser advised a flowage easement value of $92.75 (voluntarily increased to a nominal $1,400, or $200 per plaintiff) for 35.57 affected acres, we have sifted the record closely and arrive at a figure of $4,361.46 for 72.09 affected acres, which finding 10 allocates among the various plaintiffs.

Findings 11 through 13 present the evidence of record relating to plaintiffs' claims for flood damage to crops during the years 1962, 1964, 1965, 1967–70 inclusive, and 1972. The plaintiffs, some as land owners and others as tenants under cropsharing agreements, claim a total of $139,278.99 in crop damages for the years in question, of which $76,446.-55 represents, according to their contentions, damage to growing crops by floods occurring prior to maturity of the crops, while $62,832.44 is allocated to matured crops which were damaged by floods when they were ready for harvesting. The plaintiffs' reason for the

3. Erroneously (but harmlessly) reported as 292.7 in the first opinion.

separation is that, generally speaking, growing crops are considered part of the realty and so their value may be subsumed within the compensation for the flowage easement, while mature though unsevered crops ready for harvesting are considered to be personalty and hence, according to plaintiffs, not included in the flowage easement valuation. In each claim the but-for allegation is that the floods causing the damage were attributable to the Toronto Dam and Reservoir, although the computations are based on the assumption that the crops occupied 856.34 acres which plaintiffs claim were flood prone solely because of the dam and reservoir, while we have substantially reduced this flood prone acreage to 72.09 acres. This sharp reduction would, of course, itself drastically curtail the crop damage claims even if they were reimbursable at all, which they are not.

■ The existence of flowage easements over the flood prone lands in question running to the Government since September 14, 1961, according to the defendant, or January 1, 1962, according to plaintiffs, for which the Government must pay pursuant to this decision, quite clearly precludes the recovery of crop damage in 1962 and subsequent years resulting from exercise of the easement prerogatives. Manifestly it would be improper for the Government to pay twice for the flowage rights. Compensation for a taking must be determined as of the time and place of taking. Potts v. United States, 126 F. Supp. 170, 173, 130 Ct.Cl. 88, 94 (1954). The time of taking is the date the United States enters into possession. United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). " * * * [t]he value to be ascertained does not include, and the owner is not entitled to compensation for any element resulting subsequently to or because of the taking." Olson v. United States, 292 U.S. 246, 256, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934). As stated in 2 Nichols, Eminent Domain (3d ed.) § 6.21, pp. 6–51:

Where a *defacto* taking is followed some time later by a formal vesting of title under the statutory method, the owner is not entitled to interim damages for the intervening period.

Plaintiffs' reliance on United States v. Twin City Power Co., 248 F.2d 108 (4th Cir. 1957) is misplaced. *Twin City* simply held that just compensation for the taking of land subject to a flowage easement in another must be apportioned between the owner of the fee and the owner of the easement. Had the damage to crops in the case under consideration occurred at the time of the taking, the compensation paid would require apportionment between the owner of the land and the owner of the mature crops thereon, assuming them to be different entities. But that is not the situation here. Other cases relied on by plaintiffs are not remotely in point.

■ Plaintiffs are entitled to interest from September 14, 1961, the defendant's selection as the date of taking, as a part of just compensation. The parties stipulated that the interest rate should be commensurate with those rates of interest paid by the Government in the market for its own borrowing purposes. The plaintiffs urge an interest rate of 6 percent, compounded annually from the date of taking, whereas the defendant proposes interest of 4 percent from the date of taking. The court's award of interest as part of just compensation in taking cases has traditionally been at the rate of 4 percent per annum from the taking date, although in Drakes Bay Land Co. v. United States, 459 F.2d 504, 198 Ct.Cl. 506 (1972) the court, in awarding interest at 4 percent, did so in the absence of evidence justifying a higher rate, thereby inferring that the 4 percent figure is not sacrosanct and immutable, but flexibly responsive to the ends of justice. In Carlstrom v. United States, 177 F.Supp. 245, 147 Ct.Cl. 297 (1959), the court had occasion to consider a higher rate, but found no special circumstances to justify any more than the customary 4 percent rate.

■ The special circumstance in the instant case is the stipulation of the parties to rest on the rate at which the Government borrows money. This rate is given in finding 16, *infra,* which reflects a steadily rising rate of interest for each year from 1962 through 1972 on long-term United States Government bonds, from 3.95 percent in 1962 to 5.70 percent at the end of 1972. This amount contrasts with the Federal Reserve discount rate which varied from 3 to 4 percent in 1960 to 6 percent in March 1970, and with the prime interest rate charged by the majority of commercial banks which increased from 4.5 percent in August 1960 to 5.75–6 percent by the end of 1972. It would seem most logical, in view of the agreement of the parties, to apply in this case the annually fluctuating rate on long-term United States Government bonds as listed in finding 16.

■ Under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, approved January 2, 1971, 84 Stat. 1906, 42 U.S.C. § 4654(c), the plaintiffs claim reimbursement for their "reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings." Finding 19 totals these expenses to $10,031.95, including a reasonable fee of $1,090.37 for plaintiffs' counsel which conforms to counsel's arrangements with plaintiffs for a 25 percent contingency basis. To this must be added 25 percent of the interest recoverable on the compensation awarded, referred to above. Counsel has worked arduously and skillfully for such a slender reward.

### CONCLUSION OF LAW

Upon the foregoing findings of fact and conclusions of law, which are made a part of the judgment herein, judgment is entered for plaintiffs as follows:

1. For the taking of flowage easements over plaintiffs' properties the total sum of $4,361.46, to be distributed among the individual plaintiffs as specified in the last column of the schedule in finding 10.

2. Interest thereon as part of just compensation at the rates specified in finding 16, including interest at the rate of 3.95 percent from September 14, 1961, and interest at the rate of 5.70 for 1973 and subsequent years until the date of payment.

3. Attorneys' fees allowed at 25 percent of the principal and interest awarded in paragraphs 1 and 2 of this order.

4. The following expenses of litigation totalling $10,031.35, to be divided among the individual plaintiffs in accordance with their contributions or commitments: surveyor's fees and expenses ($1,478.04); appraisers' fees and expenses ($3,300); hydrologist's fees and expenses ($1,901.06); court reporting fees ($682.20); miscellaneous expenses ($2,670.05).

5. In all other respects plaintiffs' petition is dismissed.

**Application of Charles Henry KROEKEL and Frederick Andrew Pfaff.**

**Patent Appeal No. 74–535.**

United States Court of Customs and Patent Appeals.

Nov. 7, 1974.

